# Richmond

## JULIUS JOHNSON v. COMMONWEALTH OF VIRGINIA.

January 10, 1949.

Record No. 3478.

Present, All the Justices.

*S. H. & Geo. C. Sutherland*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *Henry T. Wickham, Special Assistant to Attorney General*, for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The defendant, Julius Johnson, shot and killed Buddy Walters. He claimed the shooting was accidental. A jury convicted him of second-degree murder, fixed his punishment at fifteen years in the penitentiary and he was sentenced accordingly. He contends here that the evidence did not

support the verdict and that error was committed in giving instructions.

Johnson and Walters both worked for a coal company in Buchanan county. There was no evidence of any prior trouble between them. On a Saturday night in October, 1947, Walters, together with Clifford Lovell, was at the home of Albert Matney when Johnson joined them. Johnson appeared to be sober but testified he had been drinking beer. Matney and Walters went after whiskey and a little later came back with a bottle in a car with Wallace Justus to a place in the road where Johnson and Lovell were waiting. There these five then began drinking the whiskey, dancing and wrestling. The party went on for about an hour and during the course of it Johnson and Walters wrestled with each other. Before starting to wrestle Johnson handed his pistol, which he was carrying in his belt fully loaded, to Matney to hold. Matney began firing it into the air, intending to shoot it empty, for the reason, he said, that you couldn't tell what a bunch of men drinking would do. Johnson stopped him after he had fired twice, telling him not to shoot all the shells he had. In the wrestling match Walters threw Johnson and when they got up Johnson asked for his pistol and Matney gave it back to him.

The members of the party then stood around for a while with nothing much being said or done except maybe taking another drink. Fifteen or twenty minutes after Johnson took his pistol back, while he was standing in the road near the middle of the car, and as Walters was coming around the front end of the car about five or six feet from Johnson, the shot that killed Walters came from Johnson's pistol. It was fired from his hip or near his belt, and struck Walters in the abdomen.

No angry words preceded the shooting and the evidence discloses no difficulty between these two men other than the wrestling bout in which Walters, the deceased, was the victor. The only verbal explanation of the shooting was that offered by Johnson, who was the only witness in his

own behalf. He said that when the pistol was handed back to him he thought of taking the empty shells out for fear they might stick in the cylinder; that he stood around for a while and then when he started to take them out, the pistol went off, "I don't know just how it went off, it just went off." The pistol was a .38 special and was unloaded by swinging the cylinder out.

The defendant argues that since he testified he did not intend to shoot the pistol, but that it went off accidentally, and there was no evidence to the contrary, the jury were required to accept his explanation of it. But this argument overlooks facts and circumstances shown by the evidence which contradicted defendant's explanation and warranted the jury in rejecting it as untrue.

As the shot was fired, Walters began to sink down and defendant knew he had shot him. At that time a taxicab pulled up and Lovell said to the defendant, "There is the law, give me that gun." The defendant said, "Hell, no," and ran off down the road. He then went up to the Matney home, asked two little Matney girls to walk up the road with him to see who followed him. When they got to Lovell's house the girls stopped and said they were afraid to go farther, whereupon the defendant cursed and said, "I am the damned man that killed Buddy Walters." The girls then went on up with the defendant to his house and when they entered, defendant's brother-in-law stepped from behind the door. As he did so, defendant drew his pistol, then said, "I thought you were somebody else." He told his wife he had killed Walters. She tried to persuade him to go to bed, but he said no, he was going to leave.

When they left the house they saw two men ahead of them in the road. The defendant sent the girls down to see who they were while he hid until they came back and reported.

Defendant next went to the home of Andrew Smith and tried to get Smith to take him away that night. Smith refused and he next went to the home of Wallace Justus at about two-thirty o'clock in the morning and asked Justus

to take him to the home of defendant's father, about eight miles away. Justus insisted that he spend the night with him, but finally took him to his father's and stayed with him the rest of the night.

A deputy sheriff and other officers arrived there that afternoon with a warrant for defendant's arrest. Defendant asked the officers to let him put on a shirt, and when permission was given the defendant escaped through a window in the back of the house. The deputy went away but came back later and saw the defendant up a hollow some 300 yards away. He called to him to come down but the defendant went the other way. Later that evening the father told the officer to come back next day and he would have him ready.

During all this time and to all of these people the defendant made no claim that the shooting was accidental. He knew that he had killed a man with whom he claimed to be on friendly terms and yet he expressed no regret about it, made no effort to render aid, and showed no concern. From the moment the shot was fired his acts and words indicated a purpose to avoid arrest, a purpose which he for a time effected by escaping when the officers came to arrest him. The deceased did not die immediately but was in a hospital for several days. The defendant made no effort to see him and expressed no interest or regret to his family. His excuse for these actions, so much at variance with normal conduct when life is taken accidentally, was that he thought the father of the deceased might be mad at him and he did not want any more trouble.

It follows, of course, that the jury were not required to shut their eyes to all these facts and circumstances and accept the explanation of the killing as offered by the defendant's words. The facts and circumstances spoke much louder and more convincingly. His claim that it was accidental was to be examined in the light of his conduct. When so examined, the jury did not believe him and refused to accept his version.

When the Commonwealth has proved the commission

of a homicide, and has pointed out the accused as the criminal agaent, then it may rest its case, and unless the accused shows circumstances of justification, alleviation or excuse, a verdict of murder in the second degree will be warranted. *Litton* v. *Commonwealth*, 101 Va. 833, 44 S. E. 923; *Mercer* v. *Commonwealth*, 150 Va. 588, 594, 142 S. E. 369, 370; *Adams* v. *Commonwealth*, 163 Va. 1053, 1055, 178 S. E. 29, 30; *Mosby* v. *Commonwealth*, 168 Va. 688, 693, 190 S. E. 152, 154.

If the evidence so offered by the accused is shown to be false, and is insufficient to cause the jury to have a reasonable doubt as to his guilt, the case so made by the Commonwealth is not overcome, and a verdict of second-degree murder is still warranted.

The facts and circumstances shown in this case justified the jury's rejection of the explanation offered by the defendant, and their verdict is supported by the evidence. That being true, it was, of course, proper for the court to instruct on second-degree murder, as was done. No instruction on first-degree murder was given, it being stated in oral argument that the defendant had been previously tried and convicted of second-degree murder, which had been set aside.

Defendant next complains of the giving of Instruction No. 3 for the Commonwealth, which told the jury that "a man is presumed to intend that which he does, or which is the immediate or necessary consequences of his act." His argument is that the effect of this instruction was to tell the jury the law presumed the defendant was not telling the truth and that he intended to shoot; that presumptions are indulged to supply the place of facts and are never allowed against ascertained and established facts (*Hall* v. *Commonwealth*, 178 Va. 22, 16 S. E. (2d) 304; *Kavanaugh* v. *Wheeling*, 175 Va. 105, 7 S. E. (2d) 125).

The presumption of intended consequences is of like character and effect as those other presumptions of the criminal law, that every unlawful homicide is presumed to be murder in the second degree, and that a *prima facie* case

of first-degree murder is made by proof of a mortal wound given with a deadly weapon in the previous possession of the slayer without any or upon very slight provocation. *Adams* v. *Commonwealth, supra; Scott* v. *Commonwealth,* 143 Va. 510, 129 S. E. 360; *Thomas* v. *Commonwealth,* 186 Va. 131, 138, 41 S. E. (2d) 476, 479. In fact, the last-named presumption was stated by Judge Kelly in *Mealy* v. *Commonwealth,* 135 Va. 585, 591, 115 S. E. 528, 530, to have "its foundation in the principle of criminal law that every person is presumed to have intended the natural and probable consequences of his voluntary acts."

All these presumptions arise from facts proved. They are, of course, rebuttable, and serve merely to put the burden on the defendant to introduce evidence to explain or excuse. When he does so, then it is for the jury to say whether upon his evidence and all the other evidence there is a reasonable doubt as to the defendant's guilt.

The rule embodied in the instruction here complained of was approved and its usefulness commented on more than a century ago in *Hill* v. *Commonwealth,* 2 Gratt. (43 Va.) 594, 599, in this language:

"* * * The practical difficulty in cases of this kind, is, in determining what is sufficient evidence of deliberation. A homicide rarely declares his intention; nay, he often, under the disguise of friendship and kind offices, sedulously conceals his fatal purpose. Often the resolution to kill may be fixed, but the time and the means not determined upon. The most wilful, deliberate and premeditated murders would often go unpunished unless means existed of proving the intention, independent of the admissions or declarations of the homicide. We are of opinion that such means are furnished by the rule: 'That a man shall be taken to intend that which he does, or which is the immediate or necessary consequence of his act.' 2 Stark. Evi. 738, and the authorities there referred to."

It has been approved many times since. Minor, Law of Crimes and Punishments, p. 55; *Murphy* v. *Commonwealth,*

23 Gratt. (64 Va.) 960, 972; *Clinton* v. *Commonwealth*, 161 Va. 1084, 1089, 172 S. E. 272, 274, and many others.

Here the Commonwealth proved the deceased was killed by a bullet fired by the defendant. The presumption arising then was that his act and its consequences were intended, and that was all the instruction told the jury. The defendant then sought to explain that what happened was not his act; that he intended neither the act nor its consequences. After he introduced his own testimony to that effect, the jury had then to consider that testimony along with the testimony of the Commonwealth, in the light of the ultimate burden of the Commonwealth to prove the defendant guilty beyond a reasonable doubt. The court carefully explained this to the jury, telling them in instruction 1D that the defendant was presumed to be innocent until his guilt was established by the Commonwealth beyond all reasonable doubt, and specifically in instruction 2D, as follows:

"The Court instructs the jury, that where, as in the case at bar, the defense for the killing is an accident, the defendant is not required to prove this fact, beyond a reasonable doubt, or by a preponderance of the evidence, but the burden is on the Commonwealth to prove beyond a reasonable doubt, that said killing was not accidental, therefore if after hearing all the evidence, you have a reasonable doubt whether said killing was accidental, or that it was intentional, then you should find the defendant not guilty."

We find no error, and the judgment complained of is

*Affirmed.*