# Richmond

DAVID RANDOLPH V. COMMONWEALTH OF VIRGINIA.

November 21, 1949.

Record No. 3575.

Present, All the Justices.

The opinion states the case.

*Howard H. Carwile*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *Walter E. Rogers, Assistant Attorney General*, for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The defendant, Randolph, shot and killed Richard Manuel Wood. On his trial before a jury he was convicted of second-degree murder and sentenced to ten years in the penitentiary. He claims first that the evidence was insufficient to go to the jury or to support the verdict.

About five o'clock in the morning of June 7, 1948, the police were called to No. 1216 North 2nd Street, in Richmond, where the defendant lived. On arrival the defendant, who was standing in front of the house, told them he had shot somebody inside of the house. There they found the body of Wood, who had been killed by a shotgun blast in his chest, fired at close range. There were also two pistol bullet wounds, one in each buttock, and two bullet holes in a door of the room. The defendant admitted to the officers that he had done the shooting. He surrendered his pistol to them and they found the shotgun in the bedroom next to the room in which the body was. The stock and barrel were on the bed, the connecting piece was on the dresser and an empty shell was found in the stove.

Soon after the officers arrived the defendant told them that this man, whom he had never seen before, held him up at the point of a pistol in the 600 block of North 2nd street, and had marched him down to 1216 North 2nd street, where the shooting occurred. This had happened, he said, about twenty to twenty-five minutes before, which would have been daybreak. The officers then searched the body of the deceased and found no pistol and no money on him, and also made a thorough search of the premises occupied by the defendant, but found no pistol. A few hours later that morning the defendant gave to the police sergeant a statement in writing purporting to give the details of the killing.

He also testified as a witness on his trial. The two accounts were similar in outline but they conflicted in material respects. He testified to this effect:

He left his home about ten o'clock that night with Robert

Jones, who had two women with him. They went to the Bats club, where defendant met several more friends and a boy named Snooks, had some drinks and saw a floor show. About two o'clock they went across the street (2nd street) to the Heat Waves club, where he and Snooks met some other friends. They all had drinks and defendant paid for some out of a ten-dollar bill, putting the change in his shirt pocket. They stayed there "for quite a while" and defendant left for home about two-thirty. When he got about midway of the 700 block (he first said the 600 block) he felt someone nudge him in the back. It was this fellow with a gun, who told him it was a "stick-up" and said, "Give me all the money you've got." Defendant told him his money was in his shirt pocket "so he searched my pants pockets and took what money I had from my shirt pocket." Deceased said that unless the defendant told him where the rest of his money was he would shoot him, which "kinda scared" him, so he told the deceased, "I've got some more money at home and I live just a few more blocks down the street and I'm willing to give it to you rather than have you shoot me down in the street." Deceased then told him to keep his hands up and start walking.

When they arrived at the house, "he also got the keys from me, and so he commanded me to unlock the door." Deceased then stepped up behind him, took him by the collar and shoved the door open with his foot. Defendant then turned on the lights and deceased asked where the money was. Defendant replied that it was in the bedroom in the dresser drawer. Deceased followed him into the bedroom, stood in the doorway "and that time he drew his gun out" and told defendant if he made a false move he would shoot. Defendant pleaded with him not to shoot and said he would get the money from the dresser drawer. He said he had a gun of his own in the drawer; that he could see the deceased in the mirror as he started "getting the money up by degrees, putting a few dollar bills up on the dresser at a time." By that time the deceased "had his

gun levelled and he kinda lowered his gun a little bit and started to reach for the money and that is when I grabbed my gun." This is what he said happened then:

"I didn't face him, just grabbed my gun and kinda threw it to my left side and started firing like this you know (indicating) and after I fired all the bullets from my gun that time he had backed back to the next room and when he backed back to the next room that time I laid the pistol down and grabbed my shotgun, which was in the corner, because he was still in the house then, you see, still in this here back room. Then I got the shotgun and started back toward the door where he was standing and he had backed back clean across this other room and was standing right in the corner right near this here door and the chesterfield and so he had himself kinda braced up against the wall. This gun he had, he had it levelled at me the time I got the door open. This time he got the gun levelled I got the door open and this time I plugged him with the shotgun and when the shotgun blast hit him he kinda fell and kinda turned over to his side and as he fell this gun that was in his hand fell to the floor right down by the chesterfield."

In his written statement the defendant said that when they got to the house the deceased took the keys from him and opened the door himself; that when he went to the dresser, instead of getting the money he picked up the pistol that was in the drawer and shot the deceased; that "the man kind of wavered a little bit and looked like he was trying to pull something out of his pocket and I dropped the pistol and grabbed the gun, the shotgun which was near the dresser in the corner, and fired at the man with it. I don't recall whether I fired the shotgun once or twice."

■ Besides the inherent contradictions in defendant's accounts of what happened, what he related could have put quite a strain on the jury's credulity. Its acceptance involved their believing that only a block away from where the defendant left his friends, a stranger held him up; that he told the stranger he had more money at home, whereupon

the man marched him at pistol's point, with his arms in the air, to the defendant's home five blocks away. Although deceased did not know who or what was in the house, he forced defendant to enter, turn on the lights and then stood in the doorway with a pistol in his hand while the defendant opened a dresser drawer, got his pistol, shot at him four times, hit him twice in the back while the deceased stood facing him (so defendant testified), and then allowed defendant to get a shotgun, follow him into the next room and shoot him with that weapon—all without the deceased having fired a shot or attempted to do anything to save his life. Coupled with these extraordinary occurrences were the facts that the money procured by the supposed robbery was not found on the deceased; that the pistol by which the supposed robbery was accomplished was not found, either on the deceased or in the room where he was killed; that nobody testified as to the presence of the defendant at the two clubs; that no explanation was given of what went on between the time the defendant said the hold-up occurred and the time he said the killing happened. There was ample reason for the jury to reject the whole story as being insufficient to overcome the presumption of second-degree murder arising upon the proof that the defendant committed the homicide.

"When the Commonwealth has proved the commission of a homicide, and has pointed out the accused as the criminal agent, then it may rest its case, and unless the accused shows circumstances of justification, alleviation or excuse, a verdict of murder in the second degree will be warranted." *Johnson* v. *Commonwealth*, 188 Va. 848, 853-4, 51 S. E. (2d) 152, 154, and cases there cited.

"If the evidence so offered by the accused is shown to be false, and is insufficient to cause the jury to have a reasonable doubt as to his guilt, the case so made by the Commonwealth is not overcome, and a verdict of second-degree murder is still warranted." *Johnson* v. *Commonwealth*, *supra*, 188 Va., at p. 854, 51 S. E. (2d) at p. 154.

The jury were not required to accept the defendant's statement as to how the killing occurred simply because the defendant said it happened that way and no witnesses testified to the contrary. If from the improbability of his story and his manner of relating it, or from its contradictions within itself, or by the attending facts and circumstances, the jury are convinced that he is not speaking the truth, they may reject his testimony, even though his reputation for truth is not attacked and he is not contradicted by other witnesses. *Puckett* v. *Commonwealth*, 157 Va. 800, 808-9, 160 S. E. 19, 22; *Nelson* v. *Commonwealth*, 168 Va. 742, 750, 191 S. E. 620, 624.

The next assignment of error is to the cross-examination of the defendant with respect to why the deceased would have stood with a pistol in his hand and permitted the defendant to shoot him, as he described, without defending himself. This was on the ground that the Commonwealth's attorney knew that several hours after the officers made their search in the morning, some of them returned at noon and Jack Young, who lived in the front room adjoining defendant's apartment, handed Sergeant Wakefield a toy pistol and claimed he had found it in the room where the body was after the first search was made. Young later testified that in five minutes after the officers left, he went into the room and found this toy pistol under a table that had been moved out from the wall. If his testimony was true, it meant that the officers had moved the table out from the wall and placed it on the pistol. He contradicted himself on material points and the jury evidently concluded that this testimony was not worthy of credit.

The cross-examination was legitimate. The defendant had never claimed that the pistol held on him by the deceased was a toy pistol. He sought to have the jury believe that it was a real pistol that put him in fear. When the point was made the Commonwealth's attorney stated he did admit that what was handed to the officer was a toy pistol. Even then the defendant did not attempt to take

hold of that explanation. It was permissible, and proper, for the Commonwealth's attorney to test the truth of the defendant's story by subjecting him to searching cross-examination as to its details.

The defendant next complains because the court refused to allow him to prove that the deceased had committed other acts of violence. The objection was broad but the evidence offered was limited. It was that of Garfield Williams, who testified he had known the deceased only three or four months, in fact only since about April. Defendant's counsel stated to the court that he was relying on self-defense and wanted to prove the violent nature of the deceased; that the deceased was on parole for murder in Ohio; that he had made two assaults on the witness with a gun and had been convicted of assault and battery in police court. On objection the court ruled that specific crimes could not be proved in the absence of official court records because this witness did not know about them; and that the witness could not testify that the deceased had made attacks on him, but could testify as to his reputation for violence. Thereupon the witness was asked whether he could testify to the general reputation of the deceased for being vicious and dangerous. He replied, "Only that he drawed a pistol on me and come home and drawed one on me." This answer the court excluded but did not instruct the jury to disregard it. The witness then said he did not know the deceased well enough to testify to his reputation.

There is a division among the authorities on the question of admitting evidence of particular acts of violence on the part of the deceased where the accused relies on self-defense. Many courts hold that only the general reputation of the deceased for violence, not specific acts, may be shown. Others hold that specific acts may be shown if the defendant knew of them. See Annotation, 121 A. L. R., p. 380. This court has held, however, with the rule favored by Mr. Wigmore, that evidence of specific acts is admissible, even though unknown to the accused, when there is, other evi-

·dence of self-defense. See *Rasnake* v. *Commonwealth*, 135 Va. 677, 696, 115 S. E. 543; *Burford* v. *Commonwealth*, 179 Va. 752, 766-7, 20 S. E. (2d) 509, 515; Wigmore on Evidence, 3rd ed., vol. 1, secs. 63, 198; vol. 2, sec. 248.

 Under the facts of this case it was not reversible error to exclude the quoted answer of the witness as to the assaults by the deceased on him. When admissible, such evidence bears on the questions as to who was the aggressor or what were the reasonable apprehensions of the defendant for his life and safety. As to the latter question, says Mr. Wigmore (*supra,* vol. 2, sec. 248), "The true solution is to exercise a discretion, and to admit such facts when common sense tells us that they could legitimately affect a defendant's apprehensions." As to the former, who was the aggressor, the question is what the deceased probably did, and evidence of recent acts of violence towards a third person ought to be received if "so connected in time, place and circumstance with the homicide, as to likely characterize the deceased's conduct towards the defendant." *State* v. *Waldron,* 71 W. Va. 1, 75 S. E. 558, 560.

Here the defendant's right to shoot under the conditions he related was not in question. The issue was not whether deceased was the aggressor and the homicide excusable. If the defendant's version was true, then the deceased was always the aggressor. His defense was that he killed the deceased while the latter was committing armed robbery upon him. If that was a fact, then nothing more was needed to prove a justifiable homicide. See *Dodson* v. *Commonwealth,* 159 Va. 976, 980, 167 S. E. 260, 261; *Perkins* v. *Commonwealth,* 186 Va. 867, 876, 44 S. E. (2d) 426, 430.

Neither was the excluded evidence such as to show that deceased would likely commit robbery. The only issue here was whether the defendant's version of the killing was true. If it was, then his defense was complete and the offered testimony was not material to that defense. Its relation to the real issue was too remote to require its admission. As

a practical matter it was before the jury for what it was worth.

Complaint is also made of the court's rulings on instructions. It is argued that the evidence did not warrant the giving of any instructions on second-degree murder and malice. The propriety of such instructions is sufficiently shown in the conclusion reached above—that the evidence was sufficient to support the verdict.

The court refused defendant's offered Instructions F and G. Instruction F was on the presumption of innocence. The court gave Instruction D, which, in addition to telling the jury the effect of reasonable doubt, also told them that "The presumption of innocence is so strong that if the case be a doubtful one, the presumption is always sufficient to turn the scales in favor of the accused." It was not necessary to enlarge upon this statement by giving Instruction F. Instruction G would have told the jury that it was the duty of each juror not to surrender his convictions merely because the other jurors might be of a different opinion. It was an invitation to disagree and was properly refused. *Sims* v. *Commonwealth*, 134 Va. 736, 115 S. E. 382; *Nelson* v. *Commonwealth*, 153 Va. 909, 150 S. E. 407; *Ferrell* v. *Commonwealth*, 177 Va. 861, 14 S. E. (2d) 293.

Three witnesses testified that the defendant was of good reputation. He offered instruction M to the effect that such evidence may, "if the case is one of reasonable doubt, turn the scales in favor of the accused." It was rejected and the court gave Instruction X, telling the jury that the weight of such evidence was to be determined by them in connection with the other facts in the case. In *Mitchell* v. *Commonwealth*, 141 Va. 541, 564, 127 S. E. 368, 376, we held that the instruction given was a correct and sufficient statement of the law. It still is. *Owens* v. *Commonwealth*, 186 Va. 689, 708, 43 S. E. (2d) 895.

Exception was taken to the argument of the Commonwealth's attorney on the ground, in substance, that he argued that the defense made by the accused was false and

not sufficient to raise a reasonable doubt and overcome the legal presumption of second-degree murder. It was permissible argument. *Johnson* v. *Commonwealth, supra,* 188 Va. at p. 854, 51 S. E. (2d) at p. 154.

We find no reversible error and the judgment is

*Affirmed.*