# Richmond

ARLINGTON FARROW v. COMMONWEALTH OF VIRGINIA.

October 10, 1955.

Record No. 4412.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*T. W. Messick* and *J. A. Ellett,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Thomas M. Miller, Assistant Attorney General,* for the Commonwealth.

SMITH, J., delivered the opinion of the court.

This case is before us on a writ of error to a judgment entered upon the verdict of a jury finding the defendant, Arlington Farrow, a 33 year old negro, guilty of killing Hugh Conway Broadwell, Deputy Sheriff of Giles county. In accordance with the jury's verdict of murder in the second degree the defendant was sentenced to confinement in the penitentiary for a period of 15 years.

In his brief the defendant reduces his twelve assignments of error to six and actually argues only three questions, namely, (1) whether the trial court erred in denying his motion for a change of venue, (2) whether the evidence is sufficient to support the verdict and (3) whether the trial court erred in granting and refusing instructions. We shall first consider the contention that the trial court erred in denying his motion for a change of venue.

On the first day of the trial, June 21, 1954, the defendant filed his written motion under Code, § 19-198 for a change of venue,

wherein he alleged that there existed in Giles county "prejudice of such character as to prevent a fair and impartial trial." The motion stated as grounds that the county newspaper had given wide publicity to the case and grossly misled the citizens of the county; that the newspaper not only published such news articles but editorially advocated the giving of funds for the family of the deceased officer and to employ counsel to assist in the prosecution of defendant; that the sheriff, his deputies and the jailer refused to permit defendant's wife, father, brother and sisters to see, visit or consult with him in and about his affairs and to arrange for his defense.

We agree with the trial court in its ruling that there is no "evidence here for feeling there is anything to prevent this defendant from securing a fair and impartial trial by a jury in Giles county."

An application for a change of venue in a criminal case on the ground of local prejudice rendering impossible an impartial trial is a matter addressed to the sound discretion of the trial court and its ruling on this question will not be reversed on appeal unless the record clearly shows abuse of that discretion. The law presumes that a defendant can get a fair and impartial trial in the county in which the offense was committed. Hence, in order to overcome this presumption the burden is upon the one requesting a change of venue to show clearly that there is such a widespread feeling of prejudice on the part of the citizens of the county as will be reasonably certain to prevent a fair and impartial trial. *Hampton* v. *Commonwealth*, 190 Va. 531, 58 S. E. (2d) 288, and authorities there cited.

In support of his motion the defendant filed an affidavit of Fred B. Harkrader, a resident of Christiansburg and employer of defendant, in which Harkrader charged that on June 13, 1954, two deputy sheriffs of Giles county warned him not to give the defendant any assistance in the case and stated to him that they wanted to see defendant "burn." He also complained that he was denied the right to visit the prisoner. These charges were repeated in his testimony before the jury. In addition members of defendant's family, including his wife, father, brother, and sisters testified that they were not allowed to see the defendant while he was in jail.

The editions of April 14th and 21st, 1954, of the Giles County Virginian, the local newspaper, were introduced in evidence and reference was made to brief news articles appearing on page one, and also to an editorial in the earlier issue,

From the evidence submitted on the motion it appears that after his arrest on Saturday, April 10, 1954, and confinement in the Pearisburg jail, defendant was removed that night to the Pulaski jail where he remained until the 15th when he was returned to Pearisburg. On Monday the 12th of April members of defendant's family selected Mr. Reuben Lawson, an attorney of Roanoke, to represent the defendant and notified the Commonwealth's Attorney of Giles county who promptly communicated with this attorney. However, the defendant's wife preferred other counsel and on April 17th employed defendant's present counsel who consulted with him at once.

Defendant did not by this evidence clearly show that there was such a widespread feeling of prejudice against him in Giles county as to make it reasonably certain that he could not obtain a fair and impartial trial. The news articles printed in the local newspaper are purely factual and contain nothing calculated to excite prejudice or inflame the citizens. The editorial nowhere mentions the name of the defendant and merely approves the collection of a fund for the family of an officer killed while on duty and who was not covered by any insurance. There was no evidence to support the charge that the fund was raised for the prosecution of the defendant.

There is no merit in the claim that defendant was denied the opportunity to communicate with his family and counsel in the preparation of his defense. An attorney was selected by defendant's family two days after his arrest and when that attorney did not meet with the wife's approval she within a week employed the attorney who represented him at the preliminary hearing on April 20, 1954, ten days after his arrest, at the trial on June 21, 1954, and on this appeal. It is true that the Pearisburg jailer did not permit unrestricted visitations, but that was primarily because rules and regulations were in force at the jail that restricted everyone to visits on certain days and at specified times. However, defendant was afforded every opportunity to consult with his attorney freely and at such times as counsel desired. It is therefore clearly apparent that the restrictions on visiting complained of did not deprive defendant of any rights in the preparation or presentation of his defense.

Most of the testimony relied on by defendant in support of his motion for a change of venue was later developed in the trial of the case presumably in support of counsel's contention that the police officers of Giles county and certain state troopers were biased and

prejudiced against him. The evidence on this point in general and specifically as to whether two deputy sheriffs of Giles county threatened defendant's employer is conflicting; but even if defendant's evidence be accepted as true, the alleged bias of the officers is not alone sufficient to show such a widespread feeling of prejudice among the citizens of the county as to make it reasonably certain that defendant could not obtain a fair and impartial trial.

We turn now to the issue of whether the evidence is sufficient to support the verdict. We are asked to reverse the judgment primarily on the ground that under the evidence the trial court "should have held as a matter of law, that the homicide was justifiable or excusable; accidental killing in self-defense or in defense of habitation."

While our decision on this issue of the sufficiency of the evidence requires a clear understanding of the evidence viewed in the light of the verdict, counsel for both parties have failed to include in the printed record all of the evidence material to this question. Consequently, it has been necessary for us to read the original transcript of the voluminous testimony of over forty witnesses to determine what are the pertinent and controlling facts.

It is the duty of the appellant or his counsel to present an intelligible record to this court, especially where the sufficiency of the evidence is involved. *Lewis v. Commonwealth*, 193 Va. 612, 615, 70 S. E. (2d) 293; Rule 5:1, § 6 (f). Yet we find that both the printed record and defendant's brief contain practically none of the germane evidence we are asked to hold insufficient to support the verdict. Indeed the printed record contains only the evidence introduced on behalf of the defendant. This failure to comply with the rules governing appeals on so vital an issue is an invitation to dismiss the writ of error. Furthermore, the defendant's brief fails to contain a "clear and concise statement of the facts;" in the entire brief there are no "references to the pages of the printed record" and although the "facts are in dispute" the brief fails to so state. Rule 5:12, § 1 (c). Moreover, the brief of defendant does not clearly state in one place "the questions involved in the appeal." Rule 5:12, § 1 (b). See *Southwest Virginia Hospitals v. Lipps*, 193 Va. 191, 68 S. E. (2d) 82; *Bonich v. Waite*, 194 Va. 374, 73 S. E. (2d) 389.

The record shows that on the afternoon of Saturday, April 10, 1954, the defendant, accompanied by his brother, James Farrow,

and his father-in-law, Sam Redmond, drove from his home in Christiansburg to the home of his father and brother near Hoge's Chapel in Giles county, where they arrived at about 4:00 p. m. They found several persons in the house, including defendant's father, James Farrow's wife, and several others, one of whom was Warren Williams, a white man who lived about three quarters of a mile from the Farrow home.

Williams testified that while he was visiting the Farrows the defendant gave him a drink of whiskey, that he told the defendant that Deputy Sheriff Broadwell might come there looking for one Clarence Smith, and that the defendant replied, "He'd better not come here without a search warrant.' " Before going to the Farrow home Williams had told Deputy Sheriffs Broadwell and Smith that he thought Clarence Smith was there.

Deputy Sheriff Broadwell had in his possession a warrant for the arrest of Clarence Smith. Twice during the afternoon of April 10, 1954, prior to talking to Warren Williams, he had stopped his car on the side of the road about 150 feet from the Farrow house and inquired of Saxton Farrow, wife of James Farrow, if Smith were there and on each occasion she replied that he was not. About 5:00 p. m. Deputy Sheriffs Broadwell and Smith decided they would both go to the Farrow home in an effort to arrest Clarence Smith; Broadwell to approach the front of the house while Smith approached from the rear.

As Deputy Sheriff Smith was approaching the house at about 6:20 p. m. and when he was approximately 100 yards away he heard a gun shot at the Farrow house. He immediately ran to the house and upon arrival found Broadwell, who was dressed in a police officer's uniform and wearing an officer's badge, lying on his back on the front porch with "eight or ten inches of his feet" extended inside the front room. The warrant for the arrest of Clarence Smith, charging him with a misdemeanor, was found in Broadwell's shirt pocket. The defendant was standing near the foot of the bed in the front room holding a single barrel twelve-gauge shot gun broken open as if to be reloaded. It was the hammer type of gun that is manually cocked before firing.

Smith testified that when he asked defendant if he had shot Broadwell, he said: " 'I did. If the first shot hadn't of stopped him, wouldn't have stopped him, I was getting ready to shoot him again.' " The defendant also told Smith, " 'I'm not going to let

any man run over me or my brothers.' " Smith further testified that Sam Redmond, who was standing in the room with Broadwell's pistol in his hand, "told me that he had taken the gun away from Arlington (defendant); he said Arlington was going to hit Bill Broadwell in the head with it."

Sam Redmond testified that while Henry Farrow, James Farrow, Flem Jackson, Pimp Freeman, Saxton Farrow and another woman and himself were eating supper in the kitchen, drinking whiskey, talking and laughing, the defendant called to them from the front room, " 'you all come here; I've shot the son of a bitch.' "

The shot entered Broadwell's stomach between the naval and the breast bone, killing him instantly. Dr. W. C. Caudill estimated that Broadwell, who was 35 years of age, six feet tall and weighed 250 pounds, was four to six feet from the gun when the shot was fired. Stephen C. Shelton, investigator for the Department of State Police, made tests to determine the distance between Broadwell and the muzzle of the gun and testified that in his opinion the distance was more than five feet.

Sergeant E. B. Hedrick of the Department of State Police testified that about a year before the fatal shooting defendant asked him about getting his driver's permit restored, angrily stating that he had lost it because Broadwell had lied in court against him on a charge of driving under the influence of intoxicants.

Chapman Cumby, a friend of defendant, testified that the defendant told him that Broadwell was "one son of a bitch, he's like to throw a load of shot in his belly." Cumby's wife testified that she heard the defendant make that statement to her husband.

Deputy Sheriff A. W. McNeil testified that while he was in the Pearisburg jail on the evening of the shooting the defendant told him that "Bill Broadwell come to his home without a search warrant and he just killed him." This witness further testified that when defendant told him "the Lord had told him to kill Broadwell" and that "the Lord would take care of him; that he didn't have anything to worry about, the Lord would take care of him no matter what happened," he, McNeil, became angry and hit the defendant with a chair "a couple of times across the head and arm."

During the night of April 10, 1954, the date of the homicide, State Investigator Shelton took the defendant from the Pearisburg jail to the Pulaski jail. Shelton related the following conversation between them on the way to Pulaski, after he had told defendant

that he was entitled to counsel and had advised him fully of his rights and that he did not have to tell him anything about the shooting unless he wanted to:

"At first he told me that he shot Bill Broadwell when he came into the house because Broadwell didn't have any search warrant to come into his house. And at that, I told him that Broadwell had a warrant for a man, and that there was no necessity of anyone having a search warrant; and he told me that at one time previous to this that he had his house searched illegally in Montgomery County, that some officers had broken a door down on his home while he was not there, and the next day he had gone to some attorney in Christiansburg—and he never did mention the attorney's name—and that that attorney told him then that no officer could ever go into his house without a search warrant.

"So then I told him that there was a difference in having a search warrant and a difference in having a warrant for a person; that if you were looking for a person that there was a right to go into that house. Then he changed his story to the effect that when Mr. Broadwell came up to the door, that he was standing in the door, and that Mr. Broadwell pushed him backwards, drew his gun and hit him. And he said he didn't know whether he hit him with the gun or blackjack, but he hit him. He said, when Mr. Broadwell did that, that he turned and walked over to the wall, got the shot gun off the wall, that he turned towards Mr. Broadwell and shot him."

Shelton further testified that he talked to the defendant the next morning and at that time the defendant told him the killing was "an accident, that he didn't shoot Mr. Broadwell. He said that Mr. Broadwell shoved him backwards when he went into the door, and that he went to the wall and got the gun, and as he pulled the gun off the wall that Mr. Broadwell grabbed the barrel of it and jerked it out of his hand, that the butt of the gun hit the door and went off and shot Mr. Broadwell. And when he told me that, I asked him how he could explain how Mr. Broadwell was out on the porch if that happened in the house. And he said he couldn't explain that. And then I said, 'Well, now, that gun had to be cocked with the hammer before he could shoot it.' I said, 'Who cocked the gun'? And then is when he showed me the abrasion on his arm, and he said 'That gun caught in my sleeve and cocked itself when Mr. Broadwell jerked it out of my hand.' "

From the testimony of Inspector Shelton and a floor plan drawn by him it appears that the foot of the bed in the front room of the four room Farrow house was eight feet nine inches from the front door where Broadwell was lying and that the head of the bed was almost against the wall that separated the front room from the kitchen. It was fifteen feet from this wall to the front door and on this wall above the head of the bed there were four gun racks made by driving nails into the wall. The distance from the floor to the first gun rack was about five feet and the distance to the fourth gun rack from which the defendant took his gun with which he killed Broadwell, was six feet and seven inches. In addition to the floor plan mentioned above, pictures of the exterior and interior of the house were introduced in evidence and the jury saw the premises when they visited the scene.

James Farrow testified that as Broadwell approached the house he was sitting in the front room, which was used as a combination living and bed room, and the other occupants of the house were in the kitchen eating supper. There was not room at the table for the defendant and he was standing in the doorway between the kitchen and the front room with his plate in his hand. James Farrow further testified that when he heard his wife, Saxton, say " 'Here comes Mr. Broadway down the hill, this is the third time he's been here,' " he went out to meet Broadwell and opened the gate for him to come in and walked with him to the porch steps. He also testified that he told Broadwell that Clarence Smith was not there and that when he asked Broadwell if he had a search warrant he did not answer but just kept walking.

Henry Farrow, father of the defendant, testified that defendant came to his house at about 4:00 p. m.; that Warren Williams was at his house at about that time, and that the shot gun used in killing Broadwell belonged to the defendant and had been hanging on the top gun rack. He also testified that although his guests were drinking none of them were "staggering" or "out of the way any." He further testified that upon entering the front room after the shooting he saw the defendant standing between the stove and the kitchen door, apparently placing him at about ten or twelve feet from the front door. This is also where Saxton Farrow said she found the defendant immediately after the shooting. She further testified that she saw the defendant's plate of food resting on a table in the front room after the shooting.

The defendant's testimony on direct examination as to the killing of Broadwell reads as follows:

"Q. When was the first thing that you knew Officer Broadwell was at your home

"A. Well, when Saxton said 'There come Mr. Broadway,' I was eating, and so when I didn't know where anybody was out to the front or not, and so when I went on out of the kitchen into the front door and Mr. Broadway was talking to James out there from the gate and so when I was standing right there in the door, eating.

"Q. Did you hear James ask him if he had a search warrant?

"A. Yes, sir; I sure did.

"Q. Did he make any reply?

"A. No, sir; he just come right on by James—right on.

"Q. When he came to the door, did you ask him any questions?

"A. I asked him did he have a search warrant to search the house and he never give me no answer at all.

"Q. What did he do?

"A. He shoved me back out of the door and so when I went to go back to the door, he hits me right there with his gun (indicating). That lick weren't so kind of hard and the next lick he hit me was right there (indicating).

"Q. Show the jury what you did.

"A. And so when I grabbed for my gun on the wall—so when I grabbed to the gun—and come around with it, he made a haul and grabbed it and snatched it out of my hand and it went off. (Witness indicating all the while he was speaking.)"

In answer to a question why he grabbed his gun, the defendant said, "I grabbed it for self defense." In further explanation of his action the defendant testified that, "I didn't shoot the man in self defense. When he snatched the gun out of my hand the gun caught in my underwear sleeve and shirt sleeve." He exhibited a two and a half inch abrasion on his left arm which he claimed was received when Broadwell "snatched" the gun out of his hand. He also exhibited two wounds on his head which he claimed were received when the deceased struck him as he entered the house. The defendant denied having trouble with any officers in jail or while he was in the sheriff's office, and specifically denied that Deputy Sheriff McNeil struck him with a chair or mistreated him in any way. He also testified that when Broadwell hit him the first time he had his plate of food in his hand but he did not remember putting it on a table in the room.

Four officers, including State Trooper Robert McCormick who took defendant in custody at the scene of the shooting and lodged him in jail, testified that there were no wounds or abrasions on his head or arms when he first arrived at the jail. This evidence was corroborated by the testimony of defendant's father who said that the defendant made no complaint of any wounds or injuries inflicted by Broadwell and that he did not see any such marks immediately after the shooting. Furthermore, except for the testimony of the defendant there is no other evidence that such marks existed prior to his arrival at the jail. The jury undoubtedly concluded that the defendant received these wounds and abrasions after arriving at the jail and that they were inflicted by Deputy Sheriff McNeil when he attacked the defendant with a chair. While this conduct was highly reprehensible, it was in no way prejudicial to the trial of defendant.

When the Commonwealth proved that the defendant committed the homicide with a deadly weapon there arose a presumption of murder in the second degree and unless the evidence of the defendant shows circumstances of justification, alleviation or excuse, sufficient to raise a reasonable doubt of his guilt, the verdict of the jury was warranted and must be affirmed. *Blankenship* v. *Commonwealth*, 193 Va. 587, 70 S. E. (2d) 335; *Smith* v. *Commonwealth*, 192 Va. 186, 64 S. E. (2d) 761.

On the facts of this case the defendant was entitled to an acquittal if the death of Broadwell resulted from an accident or misadventure which occurred while the defendant was in the act of defending or preparing to defend himself against an unprovoked assault. Since there was evidence that the killing was in self defense as well as accidental, the defendant was entitled to have both issues submitted to the jury. *Jones* v. *Commonwealth*, 196 Va. 10, 82 S. E. (2d) 482; *Braxton* v. *Commonwealth*, 195 Va. 275, 77 S. E. (2d) 840. This right was accorded defendant when the court at his request granted an instruction which told the jury that if the killing was accidental and not intentional then they should return a verdict of not guilty. This instruction was followed by three other instructions offered by the defendant on the theory of self defense. While the trial court amply instructed the jury on these two theories of the case, we find, however, no evidence in the record to support the instruction granted at the request of defendant on the theory that the killing was in defense of his habitation. We

therefore hold that there is no merit in the contention made in defendant's brief that he killed Broadwell in defense of his habitation.

In determining whether the evidence presented by the defendant was sufficient to overcome the presumption of murder in the second degree, either on the theory of accidental death or of self defense, we must view the evidence in the light of the verdict and accept the credible evidence and reasonable inferences to be drawn therefrom that tend to support the result reached by the jury. The jury was not required to believe the defendant's testimony as to how the killing occurred simply because he said it happened that way and no witnesses testified to the contrary. The jury had the right and the duty to reject his testimony if from its contradictions, or from the improbability of his story and his manner of relating it, or because of the attending facts and circumstances there was reason to believe that he was not speaking the truth. *Randolph* v. *Commonwealth*, 190 Va. 256, 56 S. E. (2d) 226; *Johnson* v. *Commonwealth*, 188 Va. 848, 51 S. E. (2d) 152.

The facts and circumstances attending the homicide in this case were sufficient to warrant the jury in believing that the defendant purposely and intentionally accomplished his previously stated desire to "throw a load of shot" into the "belly" of Broadwell, which desire was engendered by the defendant's stated belief that he lost his driver's permit because Broadwell had lied in court against him. His strong animosity toward Broadwell is shown not only by his remarks prior to the killing but immediately thereafter when he called to the persons in the kitchen, "You all come here; I've shot the son of a bitch." Deputy Sheriff Smith testified that he arrived at the scene within a minute and a half after he heard the shot and that the defendant freely admitted the shooting; had the gun in his hand broken open as if to be reloaded and said if the first shot "hadn't of stopped him" he was going to shoot him again.

While on the way to the Pulaski jail the defendant first told Shelton he shot Broadwell because he came into his house without a search warrant, however, when Shelton told him Broadwell had a warrant for the arrest of Smith and that he did not need a search warrant, the defendant changed his first version of the shooting and said he shot Broadwell in self defense after he had struck him with his black jack or pistol. The next morning defendant told Shelton he did not intentionally shoot Broadwell but that he was killed accidentally when he "snatched" the gun out of his hand. This last

version was related in his testimony and comprises his grounds of defense, as stated by his counsel at the bar of this court.

The jury was warranted under the evidence in believing that the shot was fired as Broadwell entered the house since his body was found on the porch with only six or eight inches of his feet and legs inside the door. He was therefore not close enough to the defendant to grab the gun. From an examination of the wound Dr. Caudill estimated that Broadwell was four to six feet from the gun and Investigator Shelton was of the opinion that the distance was more than five feet. The defendant's father and his brother's wife came into the room immediately after the shot and found the defendant standing ten or twelve feet from the front door. The evidence further shows that when the defendant heard the remark that Broadwell was approaching the house he left the kitchen with his plate in his hand and went into the front room. He testified that he was standing in the open front door with his plate in his hand when Broadwell hit him the first time, however, the plate with food on it was later found sitting on a table in the front room near the wall from which he took the gun. The evidence was on many of the issues in sharp conflict, but there was no evidence that any of the furniture in the room was disarranged and no evidence that might indicate a scuffle had occurred there and none of the occupants of the house heard any noise in the front room prior to hearing the gun shot.

The facts and circumstances attending the homicide in this case show that the jury was fully justified in rejecting the whole story of the defendant and returning a verdict of murder in the second degree.

Finally, the defendant contends in his brief that the trial court erred in granting and refusing instructions. He purports to raise this issue on appeal by the following assignments of error:

"THREE. The Trial Court erred in giving at the instance of the Commonwealth, certain highly prejudicial instructions not supported by the evidence and were in conflict with other instructions given by the Court.

"FOUR. The Trial Court erred in its refusal to give certain instructions tendered by the defendant."

Twenty-nine instructions were granted in the case, eleven for the Commonwealth and eighteen for the defendant. Fourteen instructions were refused, one requested by the Commonwealth and

thirteen requested by the defendant. Yet the defendant in his assignments of error does not specifically point out the errors relied on nor does he identify the instructions which he contends were erroneously given and refused. We have repeatedly held that in such a situation the assignments of error are insufficient to warrant our consideration because not in compliance with Rule 5:1, § 4. *Harlow* v. *Commonwealth*, 195 Va. 269, 77 S. E. (2d) 851 and cases there cited. See 1 Michie's Jur., (Cum. Supp.), Appeal and Error, § 213.

Finding no reversible error in the record, the judgment is accordingly affirmed.

*Affirmed.*