COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Bumgardner and Humphreys
Argued at Richmond, Virginia


ANTOINE LAMONT CHRISTIAN
                                        MEMORANDUM OPINION[*] BY
v.    Record No. 0212-02-2    CHIEF JUDGE JOHANNA L. FITZPATRICK
                                          DECEMBER 3, 2002
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF HENRICO COUNTY
                      George F. Tidey, Judge

          David M. Gammino for appellant.

          John H. McLees, Senior Assistant Attorney
          General (Jerry W. Kilgore, Attorney General;
          Susan M. Harris, Assistant Attorney General,
          on brief), for appellee.


     A jury convicted Antoine Lamont Christian (appellant) of

voluntary manslaughter and use of a firearm in the commission of a

felony for the shooting death of Lawrence Lavonte "Capone"

Washington (Washington).  The sole issue raised on appeal is

whether the trial court erred by excluding testimony of specific

acts of the victim to prove his disposition for violence and

turbulence.  For the following reasons, we reverse appellant's

convictions and remand for further proceedings if the Commonwealth

be so advised.

---

     [*] Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

## I.  BACKGROUND

On the afternoon of July 7, 2001 Washington and a friend each drank 44 ounces of beer.  They were "just sitting around, conversating [sic]" at the Randolph Court apartments.  Appellant and his girlfriend Shanda Trice (Trice) arrived at the apartments, and Trice approached Washington's group and greeted them.  Shortly thereafter, appellant approached the group, gave Washington "an evil look" and told Trice to "come on."  As appellant and Trice walked away from the group and toward her apartment, they appeared to be arguing.

A short time later, appellant came out of Trice's apartment and walked toward his car.  Washington approached him, and the two "had words."  Stephanie Brown stated that the two spoke for a "couple of minutes," and she saw Washington raise up his hands and say, "Naw" as he took a step backward and appellant shot him.  Shay Harris saw Washington walk over to appellant, speak to him and then saw appellant shoot Washington.  Tanya Harris said that appellant did not raise his voice and did not appear upset.  Harris stated that appellant "walked back from the car like he was going back up to Shanda's house" and that was when Washington approached him.  Appellant then shot Washington. None of the witnesses saw appellant with a gun prior to the shooting.

Appellant testified that he purchased his gun in February 2000 and carried it with him in a holster for the protection of

-

his family and himself.  Appellant stated that he was aware of shootings, drug deals and "drive-bys" in the neighborhood and that was why he carried the gun.  Appellant described the encounter with Washington as follows:

> I was coming from out my house and [Washington] said, "Hey, Nigger, let me holler at you."  So I keeps on walking to get to my car, but I never make it to my car. . . . Because he approaches me fast. He was walking over to me fast. . . . I don't know what's going on. . . . He's like "Hey Nigger, let me holler at you.  Nigger, why do you f------ keep on me?  Nigger, you want a beef?  Nigger, you want a beef, Nigger?  What the f--- you want me to do, Nigger?  I'm going to f--- your ass up, Nigger.  What the f--- you want to do?"

By this time, appellant and Washington were "face-to-face" and Washington was "yelling and screaming" at appellant.  Trice and appellant's daughter were standing next to appellant during the confrontation.  When appellant saw Washington reach for his waistband he "was scared at that time for my life.  I thought he was grabbing for a gun, so I had to protect myself."  After the shooting, appellant "ran in my car and left, because I was still scared for my life out there with his friends living there."

Appellant further stated that he had never spoken to Washington until the day of the shooting.  Although appellant "never had no dealings with him," he felt that Washington was "bad news."  However, earlier in the day, appellant saw Washington "and a couple of more young men was out there [at the Randolph Court apartments].  Once my car came past the speed

-

bump, [Washington] steps in front of my car.  I swerved over.  I ain't pay it no mind.  I just went straight on."

Washington was unarmed and died of a gunshot wound to the head.  An autopsy report revealed that Washington's blood alcohol was .20 or "two and a half times" the legal limit.  Appellant turned himself in to police on July 9, 2001.

Appellant tried to introduce into evidence two instances of Washington's character for violence and turbulence when he had been drinking.  The trial court allowed Washington's former girlfriend, Andrea Thomas, to testify.  Thomas stated that Washington drank on "a daily basis."  On March 8, 2001, after Washington had been drinking, he beat Thomas, broke her nose and stole her car.  However, the trial court refused to allow two police officers, who had attempted to arrest Washington on a separate occasion, to testify and describe Washington's aggressive behavior.  In that instance, the officers responded to a domestic dispute that arose after Washington had been drinking.  When the police arrived, Washington was arguing with his girlfriend.  Although he was initially cooperative with them, when one of the officers attempted to escort him from the apartment and told him he was under arrest, he became violent.  He fought the two officers, and they were required to use mace to subdue him.  Appellant argued that the additional testimony was crucial to his defense because it would help him to establish that Washington was the aggressor.  The trial court

-

ruled, "I don't believe that the incident with the officers is related to this. I allowed Miss Thomas to testify, because it involved a woman and some alcohol and that effects [sic] the nexus I would say to the event of this day." Appellant contends the trial court's refusal to admit the additional testimony regarding Washington's character for turbulence and violence was reversible error. We agree.

## II. ADMISSIBILITY

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Jones v. Commonwealth, 38 Va. App. 231, 236, 563 S.E.2d 364, 366 (2002) (quoting Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988)).

"It is well settled in Virginia that where an accused adduces evidence that he acted in self-defense, evidence of specific acts is admissible to show the character of the victim for turbulence and violence, even if the accused is unaware of such character." Jordan v. Commonwealth, 219 Va. 852, 855, 252 S.E.2d 323, 325 (1979) (citing Barnes v. Commonwealth, 214 Va. 24, 197 S.E.2d 189 (1973); Stover v. Commonwealth, 211 Va. 789, 180 S.E.2d 504 (1971); Randolph v. Commonwealth, 190 Va. 256, 56 S.E.2d 226 (1949)). "[S]uch evidence bears on the questions as to who was the aggressor or what were the reasonable apprehensions of the defendant for his life and safety."

-

Randolph, 190 Va. at 265, 56 S.E.2d at 230. "When evidence of prior acts of violence against third parties is admissible, a defendant is entitled to present such evidence in the most tactically advantageous manner." Craig v. Commonwealth, 14 Va. App. 842, 844-45, 419 S.E.2d 429, 431 (1992).

> The defense sought to introduce the evidence of prior drinking problems in order to support [appellant's claim of self-defense] in justification of the homicide. For that purpose the evidence was relevant and material. Where, as here, there is evidence that the victim was intoxicated at the time of the shooting, evidence of his character or reputation for turbulence when in such condition is admissible on the issue of self-defense.

Barnes, 214 Va. at 26, 197 S.E.2d at 190.

Specifically, appellant proffered the testimony of the two Henrico County police officers who had the violent encounter with the victim two years earlier on January 22, 1999. The proffered testimony showed that Washington, who had been drinking, refused to leave an apartment where his girlfriend was located, fought the officers, pushed one to the floor and the other into a wall. Although the officers were not injured, they had to use mace to subdue and control Washington. This incident was related to an argument between Washington and a former girlfriend which escalated into a brawl with the uniformed police officers. Thus, the trial court's observation that the incident involving Thomas had a nexus because it involved "a

-

woman and some alcohol" was equally true of the police officers'
proffered testimony.

"[T]he nature and quality of an overt act cannot be judged
in a vacuum.  Rather, the acts must be viewed through the eyes
of the person allegedly threatened."  Craig, 14 Va. App. at 844,
419 S.E.2d at 431.  Appellant testified that he feared for his
life when he shot Washington and that Washington had reached for
his waistband.  Appellant made it a regular practice to carry a
gun because he felt the neighborhood was not safe.  This belief
was reinforced by Officer Mule's testimony that the neighborhood
was "a high crime area."  The forensic examiner also admitted
that he had "responded to that apartment complex to collect
forensic evidence for other homicides."

"[I]n support of his claim of self-defense, [appellant] had
the right to show . . . that [Washington] was a man of
violence."  Craig, 14 Va. App. at 845, 419 S.E.2d at 431.
Appellant's attempt to show Washington's propensity for violence
when he had been drinking was clearly relevant to that issue.
The two-year time frame between the incident with the police and
the shooting was not a bar to appellant's right to adduce the
proffered testimony at trial.  "Once a nexus for relevancy of
prior conduct or character has been established, as here, the
issue of remoteness concerns the weight of the evidence and the
credibility of the witnesses, both of which are within the
province of the jury.  To bar such evidence altogether was

-

error."  Barnes, 214 Va. at 26, 197 S.E.2d at 190-91 (holding

five years was not too remote).  Moreover, appellant sought to

adduce testimony of only two incidents.  Thus, there was no

danger of cumulative testimony.

### III.  HARMLESS ERROR

The Commonwealth contends that even if the testimony was

erroneously excluded, such error was harmless.  We disagree.

> We must reverse a criminal conviction unless
> it plainly appears from the record and the
> evidence given at the trial that the error
> did not affect the verdict.  An error does
> not affect the verdict if we can determine,
> without usurping the jury's fact finding
> function, that, had the error not occurred,
> the verdict would have been the same.

Hanson v. Commonwealth, 14 Va. App. 173, 190, 416 S.E.2d 14, 24

(1992) (citing Code § 8.01-678; Lavinder v. Commonwealth, 12

Va. App. 1003, 1005, 407 S.E.2d 910, 911 (1991)) (internal

quotations omitted).

> A reviewing court must take into account the
> burden of proof applied at trial when
> evaluating the impact of an error upon a
> verdict.  To the extent that the impact of
> an error on a verdict is affected by the
> burden of proof, in a criminal case, the
> reviewing court must consider that the fact
> finder was required to reach its verdict
> beyond a reasonable doubt.

Lavinder, 12 Va. App. at 1006, 407 S.E.2d at 911 (internal

quotations omitted).  "The effect of an error on a verdict

varies widely depending upon the circumstances of the case.

Each case must, therefore, be analyzed individually to determine

-

if an error has affected the verdict."  Id. at 1009, 407 S.E.2d at 913 (internal citations and quotations omitted).

The "decisive issue" presented by the evidence at trial was whether appellant acted in self-defense.  Id.  On that issue, appellant was entitled to introduce evidence of Washington's reputation for turbulence and violence, including specific acts, when he was intoxicated.  The police officers' proffered testimony was relevant and probative of Washington's character for turbulence and violence when drinking.  The Commonwealth specifically elicited testimony from Thomas that there "were many times when [Washington] was drinking" that the two of them "got along just great" and that the beating was a "one time event."  Clearly evidence of another violent episode when Washington was drunk was highly probative of who the aggressor was in this case.  Without usurping the jury's fact finding function, it is impossible for us to say whether this evidence would have affected the verdict.  Accordingly, we reverse and remand the case to the trial court for a new trial.

Reversed and remanded.

-