# Richmond

GEORGE FERRELL V. COMMONWEALTH OF VIRGINIA.

April 21, 1941.

Record No. 2395.

Present, All the Justices.

*Royston Jester, Jr.,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Jos. L. Kelly, Jr., Assistant Attorney-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

George Ferrell has been indicted for murder, tried, found guilty of murder in the second degree and sentenced to a five-year term in the penitentiary. He is about sixty years old and for the past thirty years has been an employee of the Lynchburg Foundry Company. His reputation is excellent, and he appears to have heretofore conducted himself as a law-abiding citizen. The evidence upon which his conviction rests is circumstantial.

Irvin Thornhill was murdered at his home on December 9, 1938, at about half-past seven o'clock at night. He had gone to an outhouse in the backyard for coal, was shot while there and stumbled back by his front porch, where he fell and died.

His home and Ferrell's are in a negro suburb near Lynchburg and are five or six hundred yards apart. Thornhill was Ferrell's son-in-law, and there is no substantial evidence of unfriendly relationship.

The day had been a rainy one. At about six o'clock Ferrell came to his home and ate supper. He had nine

children, four of whom were with him—George, Jr., Laura, Maria and Iris. They were called to testify on behalf of the Commonwealth.

After supper George went down to the Thornhill home. The daughters went to a nearby store. This was Ferrell's second trial. One of them, Maria, was questioned as to evidence given at the first. This is an excerpt of her evidence given at that under review:

"Q. Do you remember testifying in this case before?

"A. I do.

"Q. Do you remember what your testimony was then as to why you went down to the store?

"A. I don't exactly recall it.

"Q. Now, I am not trying to impeach you. I want to see if I can call your attention—do you remember testifying: 'I left because my sister said she saw my father with the gun?' Do you remember that testimony?

"A. I remember saying something like that.

"Q. Wasn't that the real reason, Maria?

"A. It wasn't the real reason because I had been in the habit of going down there any time.

"Q. You didn't get scared?

"A. I got slightly frightened."

In the cornfield back of Thornhill's house was found an "empty Peters' High Velocity" shotgun cartridge, blue in color, and between the shell and where Thornhill was shot was a wad which appeared to have come from a shell. It also appears to have been loaded with chilled shot and to have been fired by one who stood ten or fifteen yards away. Across the cornfield were found tracks leading to a point near the empty shell, but no distinct outgoing tracks could be located. There had been a heavy rain during the afternoon but little was falling at the time of the homicide. In one of the tracks across the cornfield appeared a fairly clear impression of a rubber heel, in which was a diamond-shaped figure. A plaster cast was made of it and enlarged photographs of it were taken. R. F. Pfofman, an expert from the Fed-

eral Bureau of Investigation, pointed out to the jury eight or nine points of similarity between the cast and the heel of the shoe which was taken from Ferrell by officers when they visited his home that night. He testified, in part, as to the similarity between the plaster cast and the shoe heel:

"All examinations were made from the cast itself and from the heel of the shoe itself. These are merely for purposes of illustration, to illustrate to the court and gentlemen of the jury the various points I examined in arriving at the basis of my examination. Over here on the photograph of the heel you will note we have the various rings for the nails in attaching the heel to the shoe. At the lower left corner of the heel photograph we find a nail hole. Over here at the lower left corners of the photograph of the chart of the plaster cast we find a similar hole which corresponds to the one on the heel. At the lower right-hand corner of each of the two photographs is a similar hole. The distance was measured on the plaster of paris cast between the two holes here at opposite lower corners of the plaster cast and it was found to be in agreement with the distance between the two holes between the lower corners of the heel itself. Directly above the hole in the lower left corner of the heel, about half-way up on the heel, we find a second hole. Over on the chart of the plaster of paris cast we find a similar hole. The distance was measured diagonally from this upper hole to the hole in the lower right corner, both on the heel and on the plaster of paris cast. Those dimensions were found to be in agreement".

The officers "on information" went immediately to Ferrell's home, reaching there about eight o'clock, and found in it Ferrell and another negro man, who had already brought to him news of the shooting. They found there a twelve-gauge shotgun, which appeared to have been recently cleaned, and other loaded shotgun shells but none like that with which Thornhill was killed. State police officer Fizer broke the gun and "smelled

right between where the barrel and the firing pin works very closely and I thought I detected the odor of gunpowder." An oil can, known to the trade as "three-in-one" and commonly used for cleaning guns, stood with its top off on the table. His shoes had recently been wiped clean, and his trousers were damp below the knees.

Bloodhounds were brought to the Thornhill home, but they could not take up the trail, possibly because there were a world of tracks made by neighbors who had been milling around.

This blue cartridge shell was taken to Washington, where it was examined by T. A. Baughman, a technical expert of the Federal Bureau of Investigation, where he had been employed for twenty years, six of which had been devoted to the examination of firearms. Tests were made and other shells were fired from Ferrell's gun. His evidence is interesting; he tells us of his methods:

"The markings to which I referred upon the breach-face of the weapon and which were reproduced upon each of the test shells which I fired in there are these little marks upon this flattened area of the primer or cap. This is the cap to which I am pointing here. They are too small to be seen with the naked eye and accordingly they were photographed through a comparison microscope. Commonwealth Exhibit F is the marking upon this photograph. Through the center of the photograph will be noted a line. To the left of that center line and above, indicated by the letter 'E' there is a photograph of the questioned shell which Mr. Phillips delivered to me. To the right of that center line above this portion marked 'T' is a photograph of the test shell, which is this shell here, which I fired in the weapon. The breach-face markings to which I referred are these small lines through here. This evidence shell, or the questioned shell, is the one on the right of the test shell which I fired. Similar indentations or dent made in the primer

cap by the firing pin of the weapon, the center of the head of the shell. The bottom of that dent I found similarities on each of the test shells which I fired to points down in the bottom of that dent on the shell which Mr. Phillips delivered to me. On this photograph which is marked 'Commonwealth's Exhibit I' is a photograph taken through the comparison microscope with the center line dividing the questioned shell which Mr. Phillips delivered to me and the test shell which I fired. Down in the area in the center of this section, left section, and in the center of the right section, is the bottom of that dent made in the primer by the firing pin and it was similar down in this portion, this lower right-hand portion of this dent, to a point in the right-hand portion, lower righthand portion of the right-hand photograph, or test shell, which I examined and compared. The third photograph marked 'Commonwealth's Exhibit J' the bottom portion is a photograph of the questioned shell which Mr. Phillips brought to me. At the top is a photograph of the test shell which I have here, and which I fired in the weapon. I have placed one upon the other and attached it with staples and cut this section through on that portion so that the test shell which I fired could be compared with portions of the questioned shell where they overlap showing the similarities here. This portion, the upper left-hand portion of the darkened area in the center, it is those minute markings, very small, which can't be seen with the naked eye but which show up under this magnification, which I examined and compared. Does that cover your question?''

■ It is contended that the plaster cast of a shoe heel print found near the Thornhill home should not have been admitted in evidence. We are told how it came to be made:

State Police Officer Snell said:

''Q. At the place where the shell was found how many tracks did you see there?

"A. You could track it up to where he come up and where he stood there.

"Q. Now, can you describe the track that you saw there to some extent?

"A. Well, it had a kind of a diamond-shaped heel on it.

"Q. Is that (handing the witness a shoe) something like the heel?

"A. Yes, sir. We afterwards got the shoe and carried it down there.

"Q. Whose shoe did you get?

"A. Took it off of this colored fellow, George Ferrell.

"Q. Took the shoe off of George Ferrell. Did you take it back to the cornfield and compare it with the track there?

"A. Yes, sir.

"Q. And how did it compare?

"A. Looked like to me it was the same track, as far as I could tell."

Paul Phillips, a deputy sheriff, found tracks across this cornfield which led to within about twenty yards of the Thornhill home. He then took with him C. O. Deaner of Lynchburg, who made a plaster cast of one distinct heel print in this cornfield and within twenty-five or thirty steps of decedent's home.

It must have been made after the heavy rain which fell in mid-afternoon; and if it be a cast of Ferrell's shoe heel, this track must have been made between that time and the time of the homicide. It tends to show that Ferrell was in that vicinity. Its weight was for the jury, but it was plainly competent.

Next is this assignment of error:

"In allowing the witness, Baughman, to express an opinion that the shell found near Thornhill's house was fired in petitioner's gun without requiring him to make tests before the jury."

It will be noted that the objection was directed not to Baughman's expression of opinion but to the fact that he

was permitted to so express himself without requiring him to make tests before the jury.

To require tests of this character is largely a matter within the discretion of the trial court. Plainly a physician would not be asked to redissect in the jury's presence the body of one long dead. However, if there was doubt about the contents of a canister, whether black powder or coal dust, that could be settled in the presence of the jury safely, expeditiously and conclusively. Such a test would doubtless be ordered. Whether Baughman should be required to bring with him the paraphernalia of his office, cameras, microscopes, etc., was a matter for the court.

"Experiments may be permitted in the course of the trial of criminal prosecutions, or evidence may be given, in such cases, of experiments conducted outside of court, subject to the same rules and limitations governing the use of experiments and the admissibility of evidence of experiments in civil cases. * * * "

To the same effect is a note in 85 A. L. R., p. 482, citing many cases, where it is said:

"In addition to the cases cited in the earlier annotation to the effect that the admission of evidence of experiments, or permitting them to be performed in court, is a matter peculiarly within the discretion of the trial judge, and that this discretion will not be interfered with unless it is apparent that it has been abused, the rule is supported by the following more recent decisions: * * * " citing many cases.

Let us assume that the right of this witness to express any opinion at all was drawn into question. After he had stated the results of his tests and the methods adopted, this occurred:

"By Mr. Thompson: Would you gentlemen of the jury like to examine and look at them closely? You may take them and look at them if you wish to.

"Q. Then your conclusion was that the same gun fired the test shell and the evidence shell, the one you fired and the one delivered by Mr. Phillips?

"A. Yes, sir.

"By Mr. Jester: We object to the opinion of this witness.

"By the Court: Overruled."

■ " * * * Such opinion testimony is admissible not only when scientific knowledge is required, but when experience and observation in a special calling give the expert knowledge of a subject beyond that of persons of common intelligence and ordinary experience. The scope of such evidence extends to any subject in respect of which one may derive special knowledge by experience, when his knowledge of the matter in relation to which his opinion is asked is such, or so great, that it will probably aid the trier in the search for the truth." 20 Am. Jur., p. 650.

■ Hypothetical questions are commonly admitted. If his own testimony has already covered the case and has been nowhere questioned, an expert should be permitted to state what he believes is to be deduced therefrom just as he should be permitted to state what is to be deduced from the testimony of others.

"Although there are some few decisions of the courts on the introduction of expert evidence to identify the weapon from which a shot was fired, not until recent years has the science of ballistics become one of great importance in ferreting out crime that otherwise could not be detected. * * * " Note 66 A. L. R., p. 373, and cases there relied upon for support.

■ Wherever "the facts stated, as well as knowledge of the facts themselves, depend on professional or scientific knowledge or skill not within the range of ordinary training or intelligence" conclusions may be testified to by an ordinary expert. 11 R. C. L., p. 573.

In *Evans* v. *Commonwealth,* 230 Ky. 411, 19 S. W. (2d) 1091, 66 A. L. R. 360, and note, this testimony of a witness was admitted:

" 'I am convinced as a result of this test that the bullet in evidence was fired through the pistol in evidence

376, 281.' A reading of that answer shows the witness did not state that as a fact, but stated that, from his observation, he was convinced. In other words, he stated that as his opinion. In like manner, when testifying about the shells, he said: 'I am satisfied they were fired through the pistol in evidence.' ''

It will be noted that this witness gave no opinion as to the ultimate conclusions which the jury should reach but merely said that all of these shells had been fired from one gun; and that is all that Baughman said.

In *State* v. *Boccadoro,* 105 N. J. L. 352, 144 A. 612, a ballistic expert was permitted to testify that a certain bullet had been fired from the same pistol that had fired another, whose origin had been proven.

In *Commonwealth* v. *Best,* 180 Mass. 492, 62 N. E. 748, opinion by Holmes, C. J., a witness was permitted to say that a certain bullet had been fired from a certain rifle. There photographs were admitted in evidence. They are not made incompetent in the instant case because identity has been established by enlarged photographs. Evidence of this character commonly comes in forgery cases, and experts are permitted to say that given signatures are not written by the same hand where discrepancies are pointed out.

██ Objection is made to this instruction:

"The court instructs the jury that whoever kills a human being with malice aforethought is guilty of murder, and that a murder that is perpetrated by lying in wait, or any kind of wilful, deliberate and premeditated killing is murder in the first degree; that a mortal wound given with a deadly weapon in the previous possession of the slayer without any or upon slight provocation, is *prima facie* wilful, deliberate and premeditated killing, and throws upon the defendant the necessity of proving extenuating circumstances.''

It is a stock instruction and could not possibly have misled the jury.

This instruction was refused:

"The court further instructs the jury that if any juror in this case has such reasonable doubt after hearing the evidence in this case, receiving their instructions from the court, and listening to the arguments of counsel, such juror should not agree to a conviction of the accused that is opposed by such a doubt."

It was an invitation to the jury to disagree and should have been rejected. "Jurors should not be invited to disagree if they can." *Sims* v. *Commonwealth*, 134 Va. 736, 115 S. E. 382.

Moreover, the jury had already been amply instructed as to presumptions and reasonable doubt.

Ferrell said that he had not recently been in the cornfield where the heel mark was found; that he had not frightened his children; that he did not have his gun in hand that night; that he had not recently cleaned his gun; that his trousers were damp because he had come home after a rain; that he had cleaned his shoes merely because they were muddy. He further said that he never owned one of these "Peters High Velocity" shells in his life; that he did not remember having handled a rag at all; that he did not know how its charred remains got into the stove, but that he had put wood in it to cook his supper; that relations with Thornhill were entirely cordial, and that he knew nothing about Thornhill's death until he was told of it by his negro friend who came to the home before the officers arrived.

The evidence relied upon by the Commonwealth is wholly circumstantial, and no motive has been shown; but motive, or its absence, is not proof of a substantive fact, although it does strengthen the presumption of innocence.

"Motive not a necessity.—The presence or absence of motive in cases depending wholly on circumstantial evidence is not a factor that determines either the guilt or the innocence of the accused. Proof of motive does not establish guilt, nor want of it establish innocence; but while such proof is not a necessity, it is of great importance, and the absence of motive is a factor for the

consideration of the jury, but only as bearing on the question whether or not the crime was committed by the accused.'' Wharton's Criminal Evidence, 10 Ed. Vol. II, section 878. Wigmore on Evidence, section 1119.

Ferrell did own a shotgun; it was found in his home recently cleaned. If we put aside all else that has been said and accept as true the evidence of the ballistic expert—and it has nowhere been challenged as to truthfulness—the conclusions reached by the jury are inescapable, although we may never know why this man killed his son-in-law.

The judgment appealed from should be affirmed, and it is so ordered.

*Affirmed.*