# Richmond

## Melvin Davis Rees, Jr. v. Commonwealth of Virginia.

October 8, 1962.

Record No. 5438-R.

Present, All the Justices.

*A. W. Garnett* and *Joseph L. Savage, Jr.*, for the plaintiff in error.

*T. Stokeley Coleman, Commonwealth's Attorney*, for the Commonwealth.

*Per Curiam.*

Melvin Davis Rees, Jr., was found guilty by a jury of murder in the first degree for the slaying of Carroll Vernon Jackson, Jr., and his punishment fixed at death. His motion to set aside the verdict was overruled and judgment was entered on the verdict. To that judgment he seeks a writ of error upon the following assignments:

(1) The refusal of the court to order the transfer of the defendant from the State Penitentiary to the city jail in Fredericksburg, Virginia, so that he might be near his court-appointed attorneys.

(2) The refusal of the court to order a change of venue or change of venire, especially in view of the difficulty in obtaining a panel and of the fact that the jury deliberated less than an hour in arriving at a death sentence.

(3) The court erroneously admitted in evidence the .38 caliber pistol which was taken by unlawful search and seizure.

(4) The refusal of the court to sustain the motion to strike the Commonwealth's evidence at the conclusion of the Commonwealth's case and at the conclusion of the whole case;

The refusal of the court to rule that the evidence is insufficient to support the verdict; and

The refusal of the court to set aside the verdict as contrary to the law and evidence and award the defendant a new trial.

(5) The court erroneously admitted in evidence the testimony of many witnesses relative to the finding of the two bodies in Maryland.

(6) The court erroneously admitted in evidence the testimony of Thornton Shackelford.

In passing on the defendant's motion for a new trial the lower court, in an exhaustive written opinion, considered the sufficiency of the evidence and the other matters presented in the assignments of error. A careful review of the record convinces us that the judgment of the lower court is plainly right and that the writ prayed for should be denied. The written opinion of the lower court, which is a full and complete answer to the arguments advanced on behalf of the defendant on this appeal, is adopted as the opinion of this court.

"In the evening of January 11, 1959, Carroll Vernon Jackson, Jr., his wife, Mildred, and their two daughters, Janet and Susan, left the home of Mrs. Jackson's parents in Louisa County, Virginia, to drive fifteen miles to their own home. The next morning their empty car was found about half-way to their destination partly on the shoulder of the road. Skid marks of another vehicle were immediately in front of the Jackson car at an approximately forty-five degree angle to the highway.

"On March 4, 1959, the bodies of Jackson and his daughter, Janet, were found in Spotsylvania County. Jackson had been fatally shot in the head. Dr. Geoffrey T. Mann, Medical Examiner of Virginia, testified that in his opinion the wound was caused by a .38 caliber bullet. Jackson's head had been beaten severely. Dr. Mann testified that these wounds could have been caused by any number of objects including a pipe or a pistol butt.

"Near Jackson's body were found a pair of plastic gun grips (Com. Ex. 39 and 40), and Jackson's broken eyeglasses (Com. Ex. 41).

"On March 21, 1959, the bodies of Mrs. Jackson and Susan, were found near Gambrills, Maryland. Both Mrs. Jackson and her daughter had been beaten about their heads, which with aspiration of blood caused their deaths. A silk stocking was found knotted around Mrs. Jackson's neck. Marks on her neck indicated that she probably had been strangled by this stocking, although it is possible that she could have been hanged. The clothes on Mrs. Jackson and her daughter were found intact with the exception of Mrs. Jackson's coat which had been pulled over her head. A button from the coat was found in a shack not far from the bodies.

"In January 1959 the defendant, Melvin Davis Rees, Jr., was living in a beach house in Norfolk, Virginia, which he shared with a friend, Glenn Moser. Living with the defendant was a woman, Pat Rouett, who also was known as Pat Weidenhouse or Pat Rees. Rees left Norfolk in his car between 5:30 p.m. and 6:00 p.m., January 11, 1959 for Washington where he was to play the vibraphone at Harrigan's Restaurant.

"Robert Engle, manager of Harrigan's, and Phillip Troup, who was in charge of the orchestra, testified that Rees had been engaged to play in the orchestra at the restaurant over a period of several months and that occasionally he had failed to appear, but they were not able specifically to state whether he played there on the night of January 11, 1959. Moser testified that Rees said he had someone else fill the engagement.

"Mr. and Mrs. Melvin Davis Rees, Sr., parents of the defendant, testified that at 10:30 on the morning of January 12, 1959 he came to their home in Hyattsville. He appeared normal, and he helped his father gather firewood. He gave lessons that day from 3:30 p.m. to 9:00 p.m. at Flynn's Music School, Washington. William Flynn, proprietor of the school, testified he was neat in appearance. Mrs. Ivy L. Johnson, testified that she was his first pupil and he was sloppy and unshaven. His clothes appeared to have been slept in. She be-

lieved he had mud on his trousers, but of this observation she could not be certain.

"Moser testified that after the bodies of the Jacksons were found, he accused Rees of the crime, and that Rees made no denial and caused his car to collide with another car.

"The Commonwealth introduced evidence that Rees had been seen on December 28, 1958—about two weeks before the Jacksons' disappearance—approximately 29 miles from the place where Jackson's car was found. Phillip Troup testified that on December 27, 1958 Rees played in his orchestra in Alexandria, Virginia. Troup last saw Rees in the company of Pat Weidenhouse about 1:20 a.m., December 28th. Pat Weidenhouse testified on behalf of the defendant, but she made no reference to this incident.

"Rees and Pat Weidenhouse moved to Memphis, Tennessee. There on June 24, 1960 Rees was arrested on a fugitive warrant for a crime not pertinent to this case.

"On June 24, 1960 agents of the F.B.I. searched the home of Mr. and Mrs. Melvin Davis Rees, Sr. In a crawl space in the attic, the agents found an accordion case which contained among other things a .38 caliber Colt Cobra revolver. (Com. Ex. 9)

"The revolver had been sold by Rich's Department Store, Atlanta, Georgia, to William D. Bage. Bage was dissatisfied with the plastic gun grips on the revolver. He purchased a pair of simulated-horn gun grips and fastened them to the revolver. He also purchased a leather holster. In 1957 Bage, advertised the gun for sale in the newspaper and sold it, together with the holster and extra pair of plastic grips, to Rees.

"Allison C. Simms of the F.B.I. laboratories testified that the gun contained minute traces of human blood. He was unable to type this blood or determine how long it had been on the gun. He also found blood on the left gun grip, but was unable to determine whether or not it was human blood.

"George A. Berley of the F.B.I. laboratories examined both the gun, which had been found in the home of the defendant's parents, and the grips, which were found near the body of Jackson. From his examination he concluded that the right grip had at one time been on the gun. He reached this conclusion because of marks or scratches on the interior surface of the grip, which in his opinion could have been caused only by the surface of the metal on the gun butt. He was unable to find identifying marks on the left grip. He also testified that the right grip had defects, which in his opinion could have been

caused by force exerted on the grip. This force could have been caused by using the revolver, with the grips attached, to strike a blow. In his opinion the screw attaching the grips to the butt had broken.

"The jury found the defendant guilty of murder in the first degree and fixed his punishment at death. Counsel for the defendant moved to set aside the verdict as contrary to the law and the evidence assigning the following grounds:

1. The refusal of the Court to order the transfer of the defendant from the State Penitentiary to the City Jail in Fredericksburg, Virginia, so that he might be near his court-appointed attorneys.
2. The refusal of the Court to order a change of venue or change of venire, especially in view of the difficulty in obtaining a panel and of the fact that the jury deliberated less than an hour in arriving at a death sentence.
3. The Court erroneously admitted in evidence the testimony of many witnesses relative to the finding of the two bodies in Maryland.
4. The Court erroneously admitted in evidence the .38 caliber pistol which was taken by unlawful search and seizure.
5. The Court erroneously admitted in evidence the testimony of Thornton Shackelford.
6. The refusal of the Court to sustain the motion to strike the Commonwealth's evidence at the conclusion of the Commonwealth's case and at the conclusion of the whole case.
7. The action of the Court in giving and refusing certain instructions as set forth in detail in the record of the trial.
8. The evidence is insufficient to support the verdict.
9. Certain other and additional grounds which will be more fully set forth when the transcript of the trial is available. (No additional grounds were filed, however.)

"The Court overruled the motion and entered judgment on the verdict.

### ■ Motion To Transfer To The Fredericksburg Jail

"On May 26, 1961 the Court, at the request of the defendant, appointed counsel for him. The Court appointed Mr. Alfred W. Garnett, and Mr. Joseph L. Savage, Jr., of Fredericksburg, Virginia, both of whom are able, competent attorneys practicing at the bar of this Court and held in high esteem. Both have had considerable experience

practicing criminal law. They prepared their case with diligence, and throughout the trial conducted a skillful and determined defense.

"Counsel for the defendant moved that he be incarcerated in the City Jail, Fredericksburg, Virginia, instead of in the State Penitentiary, Richmond, Virginia. The motion was renewed on June 5, 1961, and later a supporting affidavit was filed.

"In order to understand this motion, it is necessary to review briefly the background of this case. The defendant previously had been convicted in the United States District Court for Maryland for kidnapping Mrs. Mildred Jackson and her daughter, Susan. He had been sentenced to life imprisonment and this judgment is final. *United States* v. *Rees*, 193 F. Supp. 849 (1961).

"On May 26, 1961 the United States Marshall for the Eastern District of Virginia produced the accused before this Court pursuant to a writ of *habeas corpus ad prosequendum*. The arrangement by which the defendant was brought to Virginia for trial is an example of the comity existing between Virginia and the United States. The procedure is based upon sound precedent. *Chapman* v. *Scott*, 10 F. 2d 690 (2d Cir. 1926) *cert. denied* 270 U.S. 657 (1926) and *Wilkinson* v. *Youell*, 180 Va. 321, 23 S.E. 2d 356 (1942).

"Mr. Chief Justice Taft said in *Ponzi* v. *Fessenden*, 258 U.S. 254, 266 (1922):
'The trial court is given all the jurisdiction needed to try and hear him by the consent of the United States, *which only insists on his being kept safely from escape or from danger, under the eye and control of its officer*. This arrangement of comity between the two governments works in no way to the prejudice of the prisoner or of either sovereignty.' (Italics added)

"The United States Marshall for the Eastern District of Virginia was charged with the protection of the defendant and with preventing self-inflicted harm. He also was charged with the duty of preventing the escape of the defendant, who was a prisoner of the United States. In the discharge of this duty, the Marshall determined that it was, in his judgment, feasible and necessary to use the facilities of the Virginia State Penitentiary for the incarceration of the prisoner.

"The Marshall in the discharge of his duty cooperated fully throughout the trial with the officers of this Court. Insofar as the Court has been advised, the Marshall cooperated in every way with the defendant's attorneys. At no time did counsel call to the attention of the Court any difficulty caused by the Marshall in the preparation or the trial of the case.

"It should be noted that Richmond is only a little more than fifty miles from Fredericksburg and that the cities are connected by a four lane highway.

"No evidence was offered in support of the motion. The Court, however, did hear argument of counsel and the statement of the Marshall in open court that he would cooperate in every way possible to make the prisoner available for conferences with his attorneys.

"The Court recognized that it was essential for adequate representation of the defendant that his counsel have an opportunity to confer privately with him in preparation of the case and during the course of the trial. To accomplish this the Court took several steps which perhaps went beyond the arrangement ordinarily made in the trial of a criminal case.

"First, on May 26th the Court delivered to the United States Marshall a letter, delivered copies to counsel, and filed a copy with the papers in the case, arranging for conferences in Richmond if such should be necessary.

"Second, the Court advised counsel that during the preliminary procedures and during the trial it would recess Court upon request of counsel in order that they could confer privately with the defendant during the case. Throughout the trial this was done on a number of occasions.

"Third, the Court recognized that counsel should have facilities for conferring privately with the defendant at Spotsylvania Courthouse. In order to make this possible, the Court secured a private office on the courthouse grounds for defense counsel.

"Before the trial, the defendant was brought to Spotsylvania Courthouse six times, May 26, June 2, June 5, July 17, September 1 and September 14. On each of these occasions, counsel for the defendant were afforded an opportunity and place privately to confer with him as long as they desired.

"The Marshall offered to bring the defendant to the courthouse as early in the morning as counsel requested and to keep him there after court in the afternoon as long as counsel wished to confer with him. At no time during the preliminary proceedings, during the trial itself, or in the hearing on the motion to set aside the verdict, did counsel for the defendant call to the attention of the Court any specific impediment to their preparation for trial or to their conduct of the trial other than the matters stated generally in their motion and affidavit.

"The Court noticed throughout the preliminary proceedings and during the trial that counsel availed themselves frequently of the facilities that had been placed at their disposal and of the recesses that were granted to them for the purpose of conferring with the defendant.

"A fourth arrangement to assist counsel for the defendant in the preparation and conduct of the trial was the agreement made between the attorney for the Commonwealth and the attorneys for the defendant. The attorney for the Commonwealth agreed to advise defense counsel of the witnesses he intended to call each day. This agreement was made with the approval of the Court, and the Court further instructed that counsel for the defendant were to have an opportunity to interview privately witnesses for the Commonwealth. The Court deemed this necessary because the Commonwealth summoned witnesses from distant cities. Counsel for the defendant had the benefit of the transcript of the trial in the United States District Court for Maryland in which most of these witnesses had testified. When necessary the Court granted recesses in order that counsel could interview witnesses.

"The defendant never moved for a continuance in order to enable his counsel to have further conferences with him. Indeed, at the opening of the trial his counsel specifically stated that the defense was ready to proceed (T. 159).

"In the opinion of the Court the matters set forth in the motion and affidavit were insufficient to show prejudice to the rights of the defendant. No specific impediment to the effective aid of counsel in the preparation or trial of the case has been shown. No continuance was sought. The defendant does not show that his incarceration in Richmond prevented counsel from preparing his defense or summoning witnesses. When the motion is carefully analyzed it is apparent that it is based on the sole fact that a little over fifty miles separated Fredericksburg and the place where the defendant was jailed. In view of the arrangements made to provide counsel and the defendant with frequent private conferences both before and during the trial, the defendant was in no way prejudiced. Finally, the preparation, ability and diligence which counsel for the defendant demonstrated throughout the case refutes any inference that the defendant was not effectively represented.

"This case, therefore, materially differs from the cases cited by counsel in the excellent brief they have prepared.

## ■ *Change of Venue and Change of Venire*

"The defendant moved for a change of venue or a change of venire (T. 7-55). In support of these motions he filed one affidavit and called five witnesses.

"The affidavit was given by the publisher of the *Free Lance-Star*, a newspaper published in Fredericksburg, Virginia. It states the circulation of the paper and the amount of news coverage pertaining to the case. No claim was made by the defendant and no evidence was introduced that the articles in the newspaper were inflammatory, prejudiced, or biased against the defendant. There was no evidence that the articles were anything other then factual news accounts. This is not sufficient to warrant a change of venue or a change of venire. *Hampton* v. *Commonwealth*, 190 Va. 531, 58 S. E. 2d 288 (1950), *cert. denied*, 339 U.S. 989 (1950).

"In the opinion of some of the defendant's witnesses an undisclosed number of people in the county were of the opinion that the defendant was guilty. It further appeared that this opinion was based primarily upon what some of the people had read in the newspapers and heard on the radio. One of the witnesses expressed the opinion that the defendant could not receive a fair and impartial trial in the county.

"There was no evidence introduced of mass prejudice against the defendant, of mob action, or threat of such action. There was no evidence of inflammatory newspaper editorials or interviews, of provocative radio or television commentaries. There was no evidence that it was the predominant belief in the county that the defendant was guilty. There was no evidence that it was the predominant belief among the people of the county that the defendant could not receive a fair and an impartial trial.

"The Commonwealth introduced the evidence of three witnesses. The gist of this testimony is that the defendant could receive a fair and impartial trial in the County. The attorney for the Commonwealth advised the Court that he had summoned thirty-two additional witnesses who were present and ready to testify. He stated, however, that their evidence would be cumulative. The Court indicated that it did not wish to hear cumulative evidence because the issue on the motions should be decided on the evidence presented and not on the number of witnesses called to testify for one party or the other.

"The lack of hostility and prejudice is not difficult to understand. Jackson's death occurred almost thirty months before the hearing on

the motions. It is well established that the Court must look to conditions at the time of the trial and not the conditions at the time of the homicide. *Evans* v. *Commonwealth*, 161 Va. 992, 170 S. E. 756 (1933).

"Interest, agitation, and apprehension concerning the case had diminished over the intervening years. Moreover, the Jackson family were not residents of Spotsylvania County. They lived in Louisa County and there was no evidence to indicate that they were closely related or well known in Spotsylvania County. Nor was the defendant known in Spotsylvania County.

"Throughout the trial there was no indication of any hostility, prejudice, bias or mob action against the defendant. Often the small courtroom was not filled. During the latter stages of the trial, particularly when it was expected that the defendant's witnesses would testify, more spectators appeared at the courthouse than could be accommodated in the courtroom. The majority of these spectators were women and they appeared to be present out of curiosity. There were no demonstrations of any kind against the defendant—either inside or outside the courtroom.

"In *Farrow* v. *Commonwealth*, 197 Va. 353, 355, 89 S.E. 2d 312, 313 (1955), Mr. Justice Smith said,

'The law presumes that a defendant can get a fair and impartial trial in the county in which the offense was committed. Hence, in order to overcome this presumption the burden is upon the one requesting a change of venue to show clearly that there is such a widespread feeling of prejudice on the part of the citizens of the county as will be reasonably certain to prevent a fair and impartial trial.'

"In *Pannill* v. *Commonwealth*, 185 Va. 244, 38 S.E.2d 457 (1946) the Supreme Court of Appeals pointed out that the court may overrule a motion for a change of venire and refuse to summon a jury from another county until an ineffectual effort has been made to obtain an impartial jury from the county where the trial is to take place.

"The jury was selected on September 18th and during the morning of September 19th. The Court previously had ordered additional jurors to be drawn and summoned so seventy-five jurors would be in attendance. Several presented evidence of ill health, and they were excused. A number of farmers qualified upon the *voir dire* examination, but upon suggestion of defense counsel claimed their right of exemption. At the end of the first day, the panel was exhausted, but

nineteen veniremen had qualified under the examination of the Court and the searching examination of counsel.

"The defendant thereupon renewed his motions which the Court overruled pointing out that a panel of twenty jurors and four alternates would have been selected had it not been for the exclusion of farmers who claimed their exemption. The Court thereupon caused to be summoned twenty-five additional jurors for attendance upon the Court the next day. From these the panel of twenty was completed and four alternates were selected, all of whom were qualified jurors.

"The defendant cites *Irvin* v. *Dowd*, 366 U.S. 717 (1961). The facts in that case are so different from the case at bar that it is not decisive of the issues here. There the build-up of prejudice was clear and convincing. Here there is no evidence of prejudice.

"Some veniremen stated they had formed some impression or opinion from what they had read in newspapers, or heard on television and radio. This alone is not a reason for disqualification, *Irvin* v. *Dowd*, 366 U.S. 717, 722 (1961), *Ballard* v. *Commonwealth*, 156 Va. 980, 999, 159 S.E. 222, 229 (1931).

"No juror who was selected had a fixed opinion which repelled the presumption of innocence. The defendant did not object to the inquiries which the Court made on *voir dire*, nor did the defendant except to rulings of the Court concerning the qualifications of the jurors.

"The defendant points out that the jury were out about thirty minutes, returned to court so a juror could ask a question concerning an inquiry that had been made about him, went out a second time and after twenty-six minutes returned their verdict. The jury were out about fifty-six minutes. The defendant speculates that they did not use all this time deliberating his case and that in any event they reached a speedy verdict which indicates he should have been granted a change of venue or venire.

"No case has been cited supporting the defendant's contention. The only Virginia case that has been called to the attention of the Court regarding the length of time a jury deliberates is *Simmons* v. *Boyd*, 199 Va. 806, 102 S.E. 2d 292 (1958). As counsel very frankly concede, that case does not support the defendant's position.

"The defendant contends that the length of time the jury stayed out, together with other factors including the length and complexity of the trial, entitles him to a new trial. This contention is without merit. No case has been cited holding that deliberation of fifty-six minutes as a matter of law shows that the jury was biased or prej-

udiced. While it is true the trial took nine days, a good deal of this time was spent in selection of a jury, recesses for the purpose of interviewing witnesses, taking testimony and hearing arguments on the admission of evidence in chambers, hearing motions in the absence of the jury and considering instructions and other matters not proper to place before the jury.

"It is also true that many witnesses were heard and exhibits admitted. But an examination of the record will show that the testimony of many of the witnesses was not highly controversial. Several witnesses, including both Commonwealth and defense, were not cross-examined. Most of the Commonwealth's evidence was uncontradicted, and this factor tended to simplify some of the issues.

"An examination of many of the exhibits and the testimony that accompanied them shows that they were so simple and so thoroughly explained from the witness stand that they required little or no additional study by the jury during their deliberations.

"The defendant points out that as the trial neared an end the Court requested the jurors to bring night clothes and toilet articles. In the brief filed in support of the motion for a new trial, the defendant interprets this to mean 'an indication from the trial judge that a longer period of deliberation was expected.' An examination of the transcript, page 1003-A shows that this interpretation is not supported by the record.

"While the Court and counsel hoped to get the case to the jury by about the middle of the next day, the Court at the time it recessed the jury could not be sure at what hour the case would be submitted. The jury throughout the trial had been alert and attentive. But the Court could form no idea, and never attempted to hazard, how long they would require for their deliberations. The Court simply indicated that regardless of when the case was submitted they would be kept in custody while they deliberated as the statute, in the discretion of the Court, provides.

"The Court is of the opinion that nothing concerning the background, circumstances, or trial of this case justified granting the defendant's motion for a change of venue or venire.

■ *Search and Seizure*

"The defendant moved to exclude evidence which was obtained by agents of the Federal Bureau of Investigation in a search of his parents' home. On September 1, 1961 the Court heard testimony, and on

September 14, 1961 counsel presented excellent written briefs and argued the motion. (T. 57-157)

"The Court excluded papers found in the home (Com. Ex. 9a-14 for identification). Admitted into evidence were the gun which the agents found (Com. Ex. 9), and the case in which the gun and papers were found (Com. Ex. 8).

"On January 24, 1960 F.B.I. agents called at the home of the defendant's parents. The agents advised them that their son was under arrest in Memphis, Tennessee, on a warrant charging unlawful flight to avoid prosecution in Maryland. The agents asked for permission to search the house and after some discussion permission was granted in writing by Mr. Rees (Com. Ex. 1) and orally by Mrs. Rees. Mr. Rees also assisted by supplying the agents with a light bulb for the attic.

"In the attic the agents noticed a hole cut through the rear of a closet leading to a crawl space. There they found a suitcase, or an accordion case, which they brought downstairs and showed to Mr. Rees. It contained the name, address, and phone number of Dennis J. Werber. Mr. Rees disclaimed any knowledge of the case or of Mr. Werber. He consented to the agents opening the case. This they did by means of a pliers and a screwdriver, since it was secured by a hasp and lock.

"In the case the agents found a gun, which was one of the specific items for which they were looking. They also found a number of papers. Mr. Rees permitted the agents to remove the case and its contents and took a receipt.

"The defendant did not regularly occupy the home in which his parents lived. He claimed to use it as a base of operation but he had not lived there with any frequency or regularity in the last two years. He had not paid any room or board since 1958 except for a small sum paid in the spring of 1960. Whether this was for current or past board was not definitely stated. When the defendant did visit his parents he was treated as a guest. He used whatever part of the premises at that time was most convenient for him to use. He had no regular room or quarters. He did not exclusively occupy and use the attic, or even the crawl space where the case was found. Other members of the household and their guests, from time to time, used various rooms in the house and also the attic. The defendant's father, testified he had cut the opening in the closet to the crawl space many years before, and he used the crawl space for storage of his belongings.

"The defendant testified he placed the locked case in the crawl

space. He retained the key. He admitted ownership of the case and of its contents.

"The articles found by the agents were identified as follows:

Commonwealth's Exhibit 8, accordion case.

Commonwealth's Exhibit 9, .38 caliber Colt Cobra revolver, with holster.

Commonwealth's Exhibit 9a for identification is a handwritten statement. It describes Jackson's murder and the brutal and perverted attack made on Mrs. Jackson. Pasted to the paper are newspaper pictures of Mrs. Jackson and her daughter with drawings added.

Commonwealth's Exhibits 10, 11, 12 and 13 for identification are newspaper and magazine clippings, and notes.

Commonwealth's Exhibit 14 for identification are magazines from which the above mentioned clippings had been taken prior to the search by the agents.

"The clippings are voluminous. They consist largely of pictures of nude or nearly nude women on which are superimposed sketches. The exhibits also contain other obscene material. Exhibits for identification 9a through 14 were not admitted in evidence before the jury.

"The defendant bases his motion upon *Mapp* v. *Ohio*, 367 U.S. 643 (1961) which holds '* * * all evidence obtained by searchers and seizure in violation of the Constitution is, by that same authority, inadmissible in a state court.'

"The issue of the reasonableness of the search is in the first instance for the determination of the trial court. Each case must be decided on its own facts and circumstances. *United States* v. *Rabinowitz*, 339 U.S. 56, 63 (1950).

"The first circumstance to consider is whether the home of Mr. and Mrs. Melvin Davis Rees, Sr., was also the home of the defendant. The Court finds that it was not. His contention that the home was used as his base of operation is without merit. He was a mature man, living with another woman in the apparent relationship of husband and wife. He had established, from time to time, homes in different cities. He was not a regular occupant of his parents' home. No room or quarters were his. Other people used the same room and quarters that he used when he visited his parents. At the time of the search he was living in a distant city. When he did come to his parents' home his status has been clearly described by his father as a 'welcome guest' (T. 132). In short, by every consideration and test common to ordinary usage and meaning, the home which the agents searched

was the home of Mr. and Mrs. Melvin Davis Rees, Sr., and not the home of the defendant.

"The Court further finds that the consent to the search was freely and intelligently given by both Mr. and Mrs. Melvin Davis Rees, Sr. There was no actual or implied coercion. The agents practiced neither trickery nor fraud.

"The accordion case which was found in the attic was in the possession of Mr. Melvin Davis Rees, Sr. The Court finds that he did not claim either the case or the gun were his son's (T. 67, 68, 118). His consent to have it opened was freely given (T. 68). He consented to the removal of the case and its contents after he had an opportunity to inspect them (T. 69).

"The Court finds that the search was not exploratory. The search was not broader than the consent which authorized it. The agents were looking for specific objects connected with the Jackson crime including the gun they found in the case (T. 75, 77, 83, 95, 96).

"The defendant cites *Holzhey* v. *United States*, 223 F. 2d 823 (5th Cir. 1955). The facts in that case differ from those in the case at bar. There evidence was introduced that the defendant was currently renting and occupying the premises and this was coupled with the testimony of an agent that he was put on notice of the defendant's claim to the cabinet which was searched. There, nothing was in the record to indicate that the officers had previous knowledge a crime had been committed. The defendant also relies on *Schwimmer* v. *United States*, 232 F. 2d 855 (8th Cir. 1956). This case is not inconsistent with the holding in the case at bar.

"A number of courts have considered the effect of a parent's consent on the legality of a search and seizure. In *Morris* v. *Commonwealth*, 306 Ky. 349, 208 S.W. 2d 58 (1948) the defendant was charged with murder. A cartridge case was found in the defendant's home. The father consented to a search of the house in which the defendant lived. The evidence was found in the kitchen which was under control of the father. The Court held that consent given by the head of the house, or the person in charge of the house, renders competent the evidence.

"In *People* v. *Galle*, 153 Cal. App. 2d 88, 314 P. 2d 58 (1957) the defendant's mother, at the request of the police, consented to a search of her home. The officers found narcotics in her son's coat pocket. The Court held that the evidence was admissible.

"In *Tomlinson* v. *State*, 129 Fla. 658, 176 So. 543 (1937) an officer told the defendant's father they would like to go in his son's room.

The father consented. The officer found a pair of shoes. These were properly admitted in evidence.

"In *State* v. *Hagan*, 47 Idaho 315, 274 P. 628 (1929) a mother consented to the search of a barn on her premises. There the officers found stolen property. The Court held that the evidence was admissible since the search was not unreasonable.

"In *United States* v. *Walker*, 190 F. 2d 481 (2d Cir. 1951) *cert. denied*, 342 U.S. 868 (1951) a motion was made to suppress evidence obtained in a search of defendant's luggage while he was in jail. The luggage was seized and searched in a hotel room of a woman who thought she was the defendant's wife. The agents' entry and search was by her consent. The court held the motion to suppress the evidence thus obtained was rightfully denied for the defendant had no right to object to the search of premises not occupied by him nor to the seizure of property not within his possession.

"In *Woodard* v. *United States*, 102 App. D.C. 393, 254 F. 2d 312 (1958) *cert. denied*, 357 U.S. 930 (1958) a householder took in without rent two boys, one of whom was her grand-nephew. She discovered among other articles several guns. She called the officers and invited them to search. It was held that this search was not unreasonable.

"The Court is of the opinion the search in the case at bar was not unreasonable.

"A very helpful annotation on this question may be found in 31 A.L.R. 2d 1078.

"The gun, which the Commonwealth contends was the weapon used to commit the crime, was an appropriate object of seizure. Section 19.1-84(5) Code of Virginia 1950.

■ "The numerous papers found in the case are of evidential nature only. They are not appropriate objects of seizure even though the search is lawful. In a Federal Court they would be inadmissible by reason of the Fourth and Fifth Amendments. See *Boyd* v. *United States*, 116 U.S. 616 (1886), and *Gouled* v. *United States*, 255 U.S. 298 (1921).

"The Commonwealth contends that the paper concerning the Jacksons (Com. Ex. 9a for ident.) is admissible because *Mapp* v. *Ohio*, *supra*, does not make the Fifth Amendment a criterion with regard to the admission of evidence in state courts.

"This argument overlooks the fact that Section 8 of the Virginia Constitution provides in part that a man shall not '***be compelled in any criminal proceedings to give evidence against himself***.' It

is significant that in Virginia no search warrant can be issued for the search and seizure of papers of an evidential nature. See Section 19.1-84 Code of Virginia 1950.

"*Powell* v. *Commonwealth,* 167 Va. 558, 189 S.E. 433 (1937) is instructive. There the attorney for the Commonwealth in the presence of the jury stated that a *subpoena duces tecum* had been served upon the defendant requiring him to produce certain notes alleged to have been forged, and in open court called upon the defendant to produce the notes. The Court held that the demand made in the presence of the jury was error. Mr. Justice Holt said, 'To demand from the accused a document from which his guilt may be inferred is scarcely less harmful than to place him upon the stand and to ask if he is guilty.' In reaching this conclusion the court relied in part on *McKnight* v. *United States,* 115 F. 972 (6th Cir. 1902) where it is said, 'The court, as we have seen, cannot compel a defendant in a criminal case to produce an incriminating writing.'

"In the *Powell* case the Supreme Court of Appeals further pointed out that the privilege against self-incrimination is highly personal and no one can waive this right for the accused except the accused himself.

"Melvin Davis Rees, Sr., could consent to the search and thus eliminate the need of a search warrant for the gun (Com. Ex. 9). However, he could not waive the protection against self-incrimination granted to his son by the Constitution of Virginia. For this reason the Court is of the opinion that the papers were not admissible in evidence. See also, *Blum* v. *State,* 94 Md. 375, 51 Atl. 26 (1902).

"In the briefs and arguments before the Court no special mention was made of the accordion case. Suffice it to say that it was not of the same class of evidence as the papers. It was simply the container in which the gun was found.

"During the trial the Commonwealth sought to introduce evidence of what the agents recalled from the handwritten document (Com. Ex. 9a for identification). The Commonwealth took the position that even though the paper itself was not admissible the agents could testify about it. The Court excluded this evidence. *Zap* v. *United States,* 328 U.S. 624 (1946), upon which the Commonwealth relies is not applicable to this case. There the defendant himself waived his rights. Here the defendant waived nothing. His privilege against self-incrimination could not be waived by his father.

### Admission and Exclusion of Evidence

"The defendant objected to evidence and exhibits pertaining to the

death of Mrs. Mildred Jackson and her daughter. The Court overruled these objections. As a general rule evidence showing the commission of other crimes is not admissible. There are, however, exceptions to this rule as well established as the rule itself. Evidence is admissible which tends to show a possible motive, intent, or a common scheme embracing a commission of two or more crimes so closely related that proof of one tends to establish the other. A number of Virginia cases deal with these principles of law. *Martin* v. *Commonwealth*, 143 Va. 479, 129 S.E. 348 (1925); *Boyd* v. *Commonwealth*, 156 Va. 934, 157 S. E. 546 (1931); Nash, *The Law of Evidence* Section 89 (1954).

"Perhaps one of the most instructive cases is *Webb* v. *Commonwealth*, 154 Va. 866, 152 S.E. 366 (1930). In that case Mr. Justice Campbell pointed out the absurdity of excluding evidence of another crime which tended to show the motive of the accused.

"In the case at bar the evidence showed that the entire Jackson family were last seen together driving toward their home. If the evidence of Mrs. Jackson's death and the death of her daughter, Susan, had been excluded there would have been absolutely no evidence before the jury concerning them. This, of course, could lead to speculation that Mrs. Jackson was guilty of her husband's murder. Moreover, if the evidence showing the cause of the deaths of Mrs. Jackson and Susan had been excluded, speculation could still have arisen that Mrs. Jackson was guilty of her husband's murder and had later committed suicide. The location of their bodies with reference to Spotsylvania County, where Jackson's body was found, and the home of the defendant's parents, where the defendant arrived the morning after the Jackson family disappeared was a pertinent circumstance. The several deaths were so intimately connected that all evidence of the death of the other members of the family should not be excluded. Moreover, the evidence tended to show a motive—abduction of Mrs. Jackson—for the murder of Jackson. Such evidence, while not essential, is important. *Ferrell* v. *Commonwealth*, 177 Va. 861, 873, 14 S.E. 2d 293, 298 (1941).

"The Court excluded photographs of Mrs. Jackson's body (T. 516). The Court was of the opinion that the evidence of the deaths of Mrs. Jackson and Susan should be limited to facts reasonably related to the circumstances of Jackson's disappearance and death. The Court also cautioned the jury that they were not trying the defendant on charges concerning other members of the family.

"The Court admitted testimony of Thornton Shackelford that he

had seen Rees on September 28, 1958 in Gordonsville, Virginia, and had seen the car Rees was driving about twenty-nine miles from the point where the Jackson car was found. Shackelford was positive in his identification. The Commonwealth limited its direct examination of the witness to the bare facts of identification, time, and location. The defense, however, showed on cross-examination that Rees had followed Shackelford's car. There was no evidence, however, in this connection that Rees had committed any crime.

"The admission of this testimony depended upon its relevancy and materiality. Evidence which tends to prove a fact from which a fact in issue may be inferred should be admitted. The weight of the evidence is for the jury. This is particularly true wtih regard to cases dependent upon circumstantial evidence. *Ruffman* v. *Commonwealth*, 168 Va. 668, 190 S.E. 265 (1937); Nash, *The Law of Evidence* page 125 (1954).

"In the case at bar the Court deemed a relevant circumstance that Rees, who lived and worked miles away, had been seen in Louisa County in the early morning hours some two weeks before the crime at a point not far from where the Jacksons' car was found.

"The Court upon objection of the defendant excluded the following evidence offered by the Commonwealth:

Testimony that a man who appeared to be Rees attempted to stop Mr. and Mrs. Keith Waldrop on the highway about 12 miles from the place where the Jackson car disappeared on the same night of the disappearance. *Day* v. *Commonwealth*, 196 Va. 907, 86 S.E. 2d 23 (1955).

Testimony that in August 1958 Rees stopped Mr. and Mrs. Tuozzo on a Maryland road. He ordered Mr. Tuozzo, at pistol point, into the trunk of the car and made a perverted sexual attack on Mrs. Tuozzo. Later both were released unharmed. *Barber* v. *Commonwealth*, 182 Va. 858, 30 S.E. 2d 565 (1944). *Limbaugh* v. *Commonwealth*, 149 Va. 383, 140 S.E. 133 (1927). *Walker* v. *Commonwealth*, 28 Va. (1 Leigh) 574 (1829).

Testimony that in June 1957, in Maryland, Rees attempted to tie the hands of Mr. Adams and place him in the trunk of the car. Rees was armed with a pistol. A struggle ensued and Adams and the young lady who was with him escaped unharmed. *Barber* v. *Commonwealth*, *supra*, *Limbaugh* v. *Commonwealth*, *supra*, *Walker* v. *Commonwealth*, *supra*.

Testimony that after Rees had been told by agents of F.B.I. that

he could remain silent, he made tacit admissions and equivocal statements. *Plymale* v. *Commonwealth*, 195 Va. 582, 79 S.E. 2d 610 (1954). *Dykeman* v. *Commonwealth*, 201 Va. 807, 113 S.E. 2d 867 (1960).

Testimony that Rees admitted to agents of the F.B.I. that he engaged in unnatural sexual relations with women. *Barber* v. *Commonwealth, supra, Limbaugh* v. *Commonwealth, supra.*

"In the admission and exclusion of evidence, the Court followed rules which have long been established in Virginia. The Court sought to observe a narrow but more or less precise line that separates the inadmissible from the admissible. Perhaps nowhere is the delineation better made than in the leading cases of *Walker* v. *Commonwealth, supra* and *Webb* v. *Commonwealth, supra.*

"Thus, evidence of other crimes which tended to show the defendant's proclivity to crime or his attitude was excluded. *Day* v. *Commonwealth, supra, Barber* v. *Commonwealth, supra, Limbaugh* v. *Commonwealth, supra, Walker* v. *Commonwealth, supra.*

"Equally well established is the rule permitting the introduction of evidence that shows motive, *Webb* v. *Commonwealth, supra,* and circumstances 'so intimately connected and blended with the main fact adduced in evidence, that they cannot be departed from with propriety; and there is no reason why the criminality of such intimate and connected circumstances, should exclude them, more than any other facts apparently innocent.' *Walker* v. *Commonwealth,* 28 Va. (1 Leigh) 574, 576 (1829) (*dictum*).

"The facts in *Hardy* v. *Commonwealth,* 110 Va. 910, 922, 67 S.E. 522, 527 (1910) are not similar to those in the case at bar. In that case, however, Mr. Justice Cardwell restated the general principles which have long been applied in determining the admission of evidence:

'Greater latitude is allowed in the presentation of evidence where it is purely circumstantial than would be admissible where it is sought to establish the contention upon direct and positive testimony. In the reception of circumstantial evidence great latitude must be allowed. The jury should have before them every fact which will enable them to elucidate the transaction and to come to a satisfactory conclusion. However remote or insignificant a fact may be, if it tends to establish a probability or improbability of a fact in issue, to make it more or less probable, it is admissible.' 3 Cyc. p. 110.

*Instructions*

"The defendant objected to Commonwealth's instructions 6 and 7 (T. 1006, 1007).

"Authority for instruction 6 may be found in *Longley* v. *Commonwealth*, 99 Va. 807, 811, 37 S.E. 339, 341 (1900) and in many other Virginia cases.

"Instruction 7 was approved in *Nelson* v. *Commonwealth*, 153 Va. 909, 923, 150 S.E. 407, 411 (1929).

"These instructions have been approved without the additional qualifying phases the defendant sought. Moreover, they must be considered along with instructions given for the defendant, particularly instructions 10, and 14.

"The Court refused instruction A offered by the defendant. *Sims* v. *Commonwealth*, 134 Va. 736, 756, 115 S.E. 382, 389 (1922), see also *Ferrell* v. *Commonwealth*, 177 Va. 861, 872, 14 S.E. 2d 293, 297 (1941).

"The other objections to the instructions were directed to the sufficiency of the evidence and will be considered in the next section of this memorandum.

■ *Sufficiency of the Evidence*

"The defendant has raised the issue of the sufficiency of the evidence by motions to strike, objections to the granting of any instructions for the Commonwealth, and specifically instruction 8, and in his motion to set aside the verdict of the jury.

"Principles governing the proof of the corpus delicti by circumstantial evidence are stated in *Bowie* v. *Commonwealth*, 184 Va. 381, 388, 35 S.E. 2d 345, 348 (1945). The law pertaining to the proof required to establish that the accused is the criminal agent may be found in *Smith* v. *Commonwealth*, 185 Va. 800, 820, 40 S.E. 2d 273, 282 (1946), and the leading case of *Dean* v. *Commonwealth*, 73 Va. (32 Gratt.) 912, 914 (1879) furnishes principles for the evaluation of circumstantial evidence that are applicable to this case.

"The death of Jackson by the criminal agency of another has been established. His body was identified (T. 429, 431-437). It was found covered with brush (T. 420). His head had been beaten (T. 474), his hands bound (T. 467). Death was attributed to a bullet wound in the head (T. 473) from a .38 caliber ball (T. 809).

"The evidence also is sufficient to sustain the verdict of the jury

finding the defendant guilty of the crime. He left Norfolk, alone, ostensibly to play in an orchestra in Washington, on January 11, 1959 between 5:30 p.m. and 6:00 p.m. in the evening (T. 544, 987). No one testified that he kept his engagement. The defendant, in answer to an inquiry by Glenn Moser, said he got someone else to play for him (T. 547).

"Jackson was last seen alive driving his family from his father-in-law's home at 9:40 p.m. that same night (T. 384, 385). The distance from his own home was about fifteen miles (T. 383). His empty car was found the next day on the highway about midway between the two houses (T. 386). About 10:00 p.m. a car pulled away from the place where the Jackson car was later found (T. 397-404).

"From Commonwealth Exhibits 15 and 16 (T. 370-376) the jury could conclude that the defendant had the time and opportunity to travel from Norfolk to the place where the Jackson car was found in the interval from the time that he left Norfolk till sometime shortly after 9:40 p.m. From these exhibits the jury also could find the defendant had the time and opportunity to deposit the bodies of the Jackson family at the two places where they were found (T. 422, 512), and arrive in Hyattsville near Washington about 10:30 in the morning of the next day (T. 967-969, 972). Neither the Commonwealth nor the defendant presented any direct evidence of where the defendant was from the time he left Norfolk until he arrived at his parents' home.

"The principal evidence linking the defendant with the crime was a .38 caliber revolver (Com. Ex. 9) and extra revolver plastic grips (Com. Ex. 39 and 40). The gun and grips had been sold to the defendant in 1957 (T. 829-852). The gun was found in the home of the defendant's parents (T. 795). It contained minute traces of human blood (T. 928). The grips were found near the body of Jackson (T. 627-649, 674-680), and near his broken glasses (T. 636). No other set of extra grips was produced in evidence.

"George A. Berley, an expert from the F.B.I. laboratory, testified that in his opinion the right grip (Com. Ex. 40) had been on the gun (Com. Ex. 9) (T. 938, 939). He also testified that in his opinion the screw holding the grip was broken when the butt of the gun had been used forcefully against some object (T. 939) and that the grip was marked and chipped by the same use (T. 942-944).

"During argument on the motion to set aside the verdict, counsel for the defendant attacked the testimony of this witness charging that at times he said he used the grip to produce similar markings to those

that he found on the grip (T. 936 and 948). On occasion the witness did use the word 'grip' interchangeably with the word 'butt.' An examination of his entire testimony however reveals that there was sufficient evidence for the jury to find that his tests were made by comparing the markings on the metal butt with the markings on the plastic grip and that the grip had indeed been on the gun (T. 932-965). The defendant also contends that the marks could have been made on the grips after they and the gun were delivered to the F.B.I. It should be observed that there is no evidence to support this supposition. The defendant also complains that the testimony of the witness was equivocal and speculative. The credibility of the witness and the weight to be accorded his testimony were proper matters for the consideration of the jury. The Court finds that his evidence as a matter of law is not insufficient to sustain the verdict. Indeed, his evidence is convincing.

"From the evidence linking the gun and grips, and the evidence of the bullet hole in Jackson's head and the wounds he had about his head, from the proximity of the grips to his broken glasses and his body, the jury could fairly infer that the gun (Com. Ex. 9) was the weapon that killed Jackson. Furthermore, the jury could infer that the defendant had the means of committing the crime, that he alone possessed the gun and grips. Indeed there is no evidence that anybody else but the defendant had them after 1957.

"The jury could find that the mark of Rees' gun—in the form of its right grip—was left at the scene of the crime, just as the jury in *Dean v. Commonwealth*, 73 Va. (32 Gratt.) 912, 922 (1879) could find that the mark of the famous Francisco gun was left on a fence rail.

"Evidence also was introduced concerning the defendant's appearance on January 12, 1959 and his conduct later. When he appeared to teach a music student he looked disorderly and sloppy in contrast to his usual neat appearance. He was unshaven and his clothes gave the appearance that he had slept in them (T. 606, 607). Evidence to the contrary was presented by the defendant's parents and employer (T. 970, 974, 976, 981), thus raising a question of credibility for the jury. Moser testified that when he accused the defendant of the crime, he made no denial (T. 551).

"The defendant also contended someone else committed the crime. This issue was presented to the jury under instruction 11. In his argument to set aside the verdict the defendant urges that Moser could be the guilty person. This defense presented a question for the jury. It does not render the verdict insufficient as a matter of law. It should

be observed that Moser and another witness testified he was in Norfolk during the evening of January 11, 1959 (T. 546, 562, 578), and a witness for the defendant testified he was not there that evening (T. 988). The jury resolved this conflict. There was no evidence that Moser ever had the gun or grips.

"The defendant contends that the Commonwealth failed to prove a motive, failed to prove that he even knew the Jacksons. The difficulty with this argument is twofold.

"First, proof of motive is not required to sustain a conviction of murder. *Ferrell* v. *Commonwealth,* 177 Va. 861, 873, 14 S.E. 2d 293, 298 (1941).

"Secondly, the evidence showed the Jackson family were together in their car when last seen alive. The jury could infer from the medical testimony that Jackson was killed first, two to five hours after his last meal (T. 480) and Mrs. Jackson was killed later, six to ten hours after her last meal (T. 666). Jackson's body was found relatively close to the location of their car. Mrs. Jackson's body was found in Maryland. A button from Mrs. Jackson's coat was found in a shack not far from her grave (T. 519, 609, 751) (Com. Ex. 33 and 38). She had a peculiar harness around her neck (T. 657, 658, 671), her knees were bruised (T. 661). The jury could conclude that the motive for Jackson's death was the abduction of his wife.

"The Court is of the opinion that the evidence was sufficient to support the jury's verdict.

"Mr. Justice Buchanan's concise statement of the law in *Orange* v. *Commonwealth,* 191 Va. 423, 435, 61 S.E. 2d 267, 272 (1950) is appropriate to this case:

'Is it sufficient also to support the finding of the jury that the defendant was the criminal agent?

'The case of Dean v. Commonwealth, 32 Gratt. 912, 73 Va. 912, has long been recognized as a classic on the subject of circumstantial evidence. The familiar principle was there stated that circumstantial evidence must always be scanned with great caution and never justifies a verdict of guilty unless the circumstances are of such character and tendency as to produce upon a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt. Added, however, was the caution that crimes are sometimes committed with such secrecy that to require the production of an eyewitness would be to defeat public justice and to permit the most heinous crimes to go unpunished. It was there stated:

'"Where all the circumstances of *time, place, motive, means, oppor-*

*tunity* and *conduct,* concur in pointing out the accused as the perpetrator of the crime, it must produce a moral, if not absolute, certainty of his guilt." 73 Va. at page 924. And when these concur, 'the evidence is powerfully strengthened by the total absence of any trace or vestige of any other agent. 1 Stark 494. 73 Va. at page 926.' "

*Writ of error denied.*